**2026 UT App 5**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHARLES TRACY CAMARA,
Appellant.

Amended Opinion*
No. 20220502-CA
Filed January 15, 2026

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 171401533

Emily Adams, Freyja Johnson, and Rachel Phillips
Ainscough, Attorneys for Appellant
Derek E. Brown and Daniel Lee Day,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Amended Opinion, in
which JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred as
to Parts I, III, and IV. JUDGE HARRIS authored a separate opinion
as to Part II that is joined by JUDGE LUTHY.

TENNEY, Judge:

---

* This amended opinion replaces the opinion that was issued on
November 28, 2025. In response to a rehearing petition from
Camara, this court has added a new subsection that addresses
Camara's claim that his counsel provided ineffective assistance by
failing to file a motion for a directed verdict on several counts.
This new analysis is set forth in Part III. To facilitate this, (1) the
Background has been revised to include additional facts and
procedural history relevant to that issue, (2) the previous Part III
has been renumbered as Part IV, and (3) this court has made a few
minor changes in other places to reflect the additional analysis.

¶1     A jury convicted Charles Tracy Camara of two counts of aggravated sexual abuse of a child, three counts of rape of a child, and five counts of sodomy on a child. Camara challenges his convictions on a number of grounds. For the reasons set forth below, we address only three of them. On those issues, we rule as follows:

- First, we affirm the district court's denial of Camara's motions to dismiss the case relating to law enforcement having made a copy of files from Camara's retained expert.

- Second, we conclude that the presumption of prejudice applies to a mistrial motion that Camara filed after learning that a juror had overheard comments made from the gallery during trial. Because of this, we reverse the district court's denial of that motion and remand with instructions for the court to determine whether the presumption of prejudice has been overcome.

- Finally, we conclude that Camara did not receive ineffective assistance when his trial counsel did not file a motion for a directed verdict on several of the counts.[1]

---

1. As indicated above and below, Judge Tenney has written the lead opinion, which is the controlling opinion as to Parts I, III, and IV. The controlling opinion on the mistrial issue is the separate opinion authored by Judge Harris.

## BACKGROUND[2]

### *Abuse and Charges*

¶2     Bree,[3] her brothers, and her mother (Mother) moved to Springville in 2013. A few months later, Bree transferred to a school in Provo that one of her brothers had been attending. Camara ran an after-school soccer club at that school, which Bree soon joined. Camara gave Bree a ride home after soccer one day, and after talking to Mother, Camara began regularly driving Bree and her brother to and from school and the soccer club. Bree eventually started going over to Camara's house after school, where he would help her with school projects. While she was at Camara's house, Bree met Camara's wife (Wife) and children.

¶3     Over the summer of 2014, Bree grew closer to Camara. Camara took Bree on a trip to Lake Powell with his extended family that summer. Bree's 12th birthday was in July 2014, and Camara threw a birthday party for her and bought her a phone.

¶4     Mother had significant health issues, and Bree's father had "never really been in the picture." As a result, Bree and her brothers had occasionally lived outside of Mother's home. When Bree started seventh grade in the fall of 2014, she began living with the Camara family full time.

¶5     The Camara family lived in a two-bedroom house. When Bree first moved in, she stayed in a bedroom with Camara's three children. Bree loved Camara and Wife. She referred to Camara as her "dad" and his children as her "brothers and sister[]." Bree and Camara would sometimes get into "really big" arguments over

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified).

3. A pseudonym.

"small things," though, and Bree moved out in early 2015 after getting into an argument with Camara about her grades. But the two reconciled, and Bree moved back into the Camara home sometime before she started her eighth-grade year at Centennial Middle School.

¶6 Around that time, Bree's relationship with Camara changed. One night Bree and Camara "slept next to each other in his kids' room on . . . the bottom bunk bed." When Bree "rolled over him to get off the bed," Camara said something and then kissed her neck. After that incident, Camara started kissing Bree's neck more often.

¶7 Another night, Bree and Camara left the house to play Ingress, which is an interactive game that Camara's family and many of their friends played using an app on their phones.[4] While sitting on a bench outside of an art museum, Camara kissed Bree's neck and then asked Bree to kiss his neck, which she did. After that occasion, Camara and Bree had other encounters in which they kissed each other on the lips. Camara soon began touching Bree's breasts over her clothes, then he began touching her breasts under her clothes, and they eventually began "dry humping with all of [their] clothes on."

¶8 On September 22, 2015, Camara and Bree drove to a secluded campsite near Kyhv Peak.[5] While there, Camara touched

---

4. Ingress is an "augmented reality" game that "uses the mobile device GPS to locate and interact with 'portals' that are in proximity to the player's real-world location." *Ingress (video game)*, Wikipedia, https://en.wikipedia.org/wiki/Ingress_(video_game) [https://perma.cc/N8PQ-7P5M].

5. In the briefs and the record, the parties refer to this as "Squaw Peak." In 2022, this peak was renamed to "Kyhv Peak" as part of "a federal order to remove the ethnic slur 'squaw' from federally owned places in the United States." *See Kyhv Peak*, Wikipedia,

(continued…)

Bree's vagina under her clothes. On September 29, 2015, Camara and Bree drove up to the Alpine Loop, which is a scenic drive in the mountains near Camara's home. On the drive up, Camara touched Bree's breasts under her shirt but over her bra. After parking at a secluded campsite, they got into the back of Camara's SUV, at which point Camara touched Bree's vagina and breasts and Bree touched Camara's penis. Camara then "inserted his penis into" her vagina, but because it hurt, "he didn't insert his penis all the way." Bree later explained that she remembered the date of this incident because she had posted a video on Instagram of herself dancing in the car while driving up the canyon that day.

¶9     When Bree and Camara got home from the Alpine Loop that night, Wife was at work and his children were asleep. Camara then "inserted his penis fully into [Bree's] vagina and had sex with [her]" on Camara's bed. Afterwards, Camara told Bree that he felt bad for cheating on Wife, and he agreed "to stop having sexual intercourse with [Bree]."

¶10     But Camara didn't stop. That Christmas, Camara cleaned out a storage room so that Bree could have her own room. In the ensuing months, Camara had sex with Bree in several places, including the car, his bed, the couch, the living room floor, and Bree's new room.

¶11     At trial, Bree was asked how many times Camara had sexual intercourse with her while she was "going to Centennial Middle School in 9th grade," to which she responded, "Probably a hundred or more times."[6] Bree testified about two instances of

_____

https://en.wikipedia.org/wiki/Kyhv_Peak [https://perma.cc/FH27 -Z5EL]. We'll refer to this as "Kyhv Peak" throughout this opinion.

6. As will be discussed in more detail below in Part III, this question contained an internal inaccuracy. Bree did not attend Centennial Middle School during ninth grade; rather, she

(continued…)

intercourse in particular. First, Bree recalled waking up in the middle of the night and going to get water, and she said that she "caught [Camara] touching his penis" in the living room. Bree said that Camara took her back to her bedroom, "inserted his penis into [her] vagina," and "had sex with [her]." Second, Bree testified about another occasion when Camara had sex with her in his car on a back road behind Mother's house after Camara and Bree had an argument.

¶12    Camara engaged in other sexual activity with Bree as well. Bree testified that he "would put his penis in [her] mouth, he would put [her] vagina in his mouth, and he also inserted his penis into [her] anal cavity." Bree testified at trial that the first time Camara put his penis in her mouth was when she was attending Centennial Middle School. She further testified that Camara put his penis in her mouth between 15 and 50 times.

¶13    Bree testified that Camara put his penis in her anus two or three times. She testified that the first time occurred on Camara's bed and "it was really painful." Bree testified that she remembered going to her United States history class shortly after this encounter and wondering if "anyone else [was] . . . going through this" "at 13" years old.

¶14    Bree moved out of Camara's house and back into Mother's house in February 2017, which was during her ninth-grade year, after Bree got into an argument with Camara over missing a parent-teacher conference. When Bree moved back in with Mother, she "started to have violent . . . panic attacks" "at least once a day" where she "couldn't breathe" and "felt like [she] was going to die."

¶15    A month or two after moving out of Camara's house, Bree reported to law enforcement that Camara had sexually assaulted her on several occasions while she lived with him and his family.

---

attended Centennial Middle School for eighth grade and Timpview High School for ninth grade.

In the summer of 2017, the State charged Camara with two counts of aggravated sexual abuse of a child, three counts of rape of a child, and five counts of sodomy on a child.

*Motions to Dismiss*

¶16   In April 2019, Camara provided notice to the State that he intended to call a technology expert (Expert) at trial. Along with this notice, Camara provided a "digital forensic report" that Expert had created. There, Expert said that he had performed a "physical dump" of the contents of Camara's cell phone, and Expert summarized the "messages between" Camara's phone and a phone that had been identified as belonging to Bree.

¶17   Two weeks later, the State obtained a search warrant from a judge who was not presiding over the case. Though the warrant itself is not in the record of this appeal, it was later described by the parties in various motions. From those motions, it seems that the State believed that the defense had "unlawfully acquired" or "unlawfully possessed" Camara's phone, and it further seems that Expert's report had alerted the State that Expert was now in possession of Camara's phone. The warrant application asserted that Camara's phone had been used "to commit or conceal the commission of an offence" and contained evidence "of the crime[s] of Aggravated Sexual Abuse of a Child, Rape of a Child, and Sodomy of a Child." The warrant that the State obtained allowed it to search Expert's residence, vehicle, and person for, among other things, "PCs, . . . internal and external hard drives, [and] storage devices, . . . and anywhere else Camara's phone or digital or paper copies of the same might be stored." When officers executed the warrant, they found and seized Camara's cell phone. Of particular note, the officers also made a copy of files from Expert's computer and put them onto an external hard drive.

¶18   After learning about this search, Camara filed a motion to dismiss the case, arguing that his Sixth Amendment rights had been violated because the State had obtained and accessed

attorney-client communications and work product. Camara also argued that the State had violated various rules, including rules 16(c) and 40(c) of the Utah Rules of Criminal Procedure, rules 504 and 506 of the Utah Rules of Evidence, and rule 26 of the Utah Rules of Civil Procedure. The district court later held an evidentiary hearing to assess whether a particular sergeant (Sergeant) had accessed or read the files that were originally on Expert's computer and that had been copied onto the officers' external hard drive. At that hearing, Sergeant testified that neither he nor any other officer had yet "looked at the hard drive."

¶19 The district court issued a ruling denying Camara's motion to dismiss. There, the court held that the State had violated rules 16(c) and 40(c) of the Utah Rules of Criminal Procedure by "circumvent[ing] the notice requirements that a subpoena would have imposed" and "obtaining a search warrant, ex parte, from a different judge for the work-product of a defense expert," and the court further concluded that the "search warrant . . . appear[ed] to constitute an attempt to violate" Camara's Sixth Amendment right to the assistance of counsel. But the court concluded that "the undisputed evidence show[ed] that the reports and work product were never examined by the State." As a result, the court concluded that there was no basis for dismissing the case. The court did, however, order the State "to return all materials obtained from [Expert] except the phone itself." And during the course of proceedings on this motion, the State also agreed to not "present any affirmative evidence . . . arising from its possession or analysis of the extraction performed" on Camara's phone by Expert that had been "obtained" as part of "the search warrant executed at [Expert's] residence."

¶20 Pursuant to the court's order, the defense obtained the external hard drive onto which officers had copied files from Expert's computer. After doing so, Expert conducted a forensic examination of the hard drive. In Expert's view, this examination showed that, contrary to Sergeant's testimony, someone had

accessed the files that had been copied onto the external hard drive. In light of this, Camara filed another motion to dismiss.

¶21　The court held a new evidentiary hearing to determine what had happened. After that hearing, the court issued a written ruling denying this second motion to dismiss. In that ruling, the court found that while the files that were copied onto the external hard drive contained some "potential work product," there was "no evidence that any work product was accessed" by the State and "no evidence that any attorney-client communications [had] been improperly disclosed." The court also found that, even if the State had accessed other information (i.e., information that was not attorney-client communications or work product), that information had already been "voluntarily disclosed" or, by rule, would be required to be disclosed to the State anyway. From all this, the court ruled that there had been "no Sixth Amendment violation" and "no appreciable impact on [Camara's] right to effective assistance of counsel," and it further ruled that "any procedural errors can and [had] been corrected by" the court's prior order. The court clarified that its prior order would "remain in effect," and it then ordered the State "to destroy the copy of the hard drive provided by [Expert] to the State." In light of all this, the court concluded that "dismissal [was] an inappropriate sanction in this case."

*Trial*

¶22　A five-day jury trial was held in the fall of 2021. At that time, the Utah Supreme Court's administrative orders for court operations during the COVID-19 pandemic were in effect.[7] Pursuant to those orders, jurors were seated in the jury box as well

---

7. *See Administrative Order for Court Operations During Pandemic*, Utah Sup. Ct. & Utah Jud. Council (Sep. 17, 2021), https://www.utcourts.gov/content/dam/alerts/docs/20210917%20 -%20Pandemic%20Administrative%20Order.pdf [https://perma.c c/B5HL-V3FG].

as in the courtroom gallery in order to achieve the required level of social distancing. In an apparent nod to the fact that she was the alleged victim, the court permitted Bree to sit in the gallery during the trial. *See* Utah R. Evid. 615(a)(4) (creating an exception to the exclusionary rule for "a victim in a criminal proceeding where the prosecutor agrees with the victim's presence").

¶23 The State presented its case through the testimonies of Bree, some of Bree's friends and family, medical experts, and law enforcement officers. In the defense case, Camara presented testimony from Expert and from various family and friends. One of these witnesses was Wife, who testified that she and the Camara children were with Camara and Bree during the drive on September 29, 2015—and, thus, that the alleged sexual encounter that Bree had described on that date had not happened.

¶24 During the portion of Wife's testimony in which she discussed this drive, the prosecutor thought he heard the word "bullshit" coming from the direction of the gallery where Bree was sitting, and the prosecutor also noticed that Juror 10 had "perk[ed] up and looked" toward Bree. The prosecutor asked for a sidebar and then told the district court what he had heard and seen. After the sidebar, the court "instruct[ed] the jurors that any comments that they may hear from the gallery are not testimony, are not evidence, [and] are not to be considered as such." The court warned that if there were any further comments, it would "have to clear the gallery."

¶25 The next witness who testified as part of the defense case was Camara's daughter. After her testimony concluded, three jurors informed the bailiff that they had heard "comments from the gallery," some of which seemed to have come "from the woman in yellow." Unbeknownst to the jurors, the woman in yellow was Bree's attorney, who had been sitting next to Bree in the gallery.

¶26 The court then questioned the three jurors separately about what they had heard.[8]

- Juror 7 said that, sometime before the court's instruction during Wife's testimony, (s)he had overheard some indistinct chatter, and (s)he also said that at one point, (s)he had heard either Bree or the person "she was talking to" say, "[S]he's lying." Juror 7 said that (s)he was not "influenced" by the statement and that (s)he could "focus on what was said . . . from the stand."

- Juror 9 said that before the court's instruction during Wife's testimony, (s)he had overheard "laughing" and indistinct "talking" but "didn't hear any specific words."

- Juror 10 said that before the court's instruction, (s)he had overheard Bree "saying that [Wife] was not in the car" and "she's lying." Juror 10 also said that after the court's instruction, and during the testimony in which Wife "was talking about dates when her children were homeschooled," (s)he had overheard, "I remember the date, it's 2016, and I wasn't even there," which (s)he "believe[d]" came from the woman "wearing the yellow blazer."

¶27 After questioning these jurors, the court excluded Bree's counsel from the courtroom for the remainder of trial. The next day, Camara's attorney (Counsel)[9] moved for a mistrial, claiming that "the statements from the gallery" evidenced "an intention to thwart the process." The court denied the motion based on its conclusion that there had been no "articulation of prejudice."

---

8. The record does not indicate the genders of the three jurors in question. When referring to them individually, we'll use "(s)he" as the singular pronoun.

9. Camara was represented by two attorneys below. We'll refer to them with the singular "Counsel" for convenience.

Before deliberations began, the court excused Jurors 9 and 10 since they were alternates.

¶28    At the close of deliberations, the jury convicted Camara on all counts.

*Rule 23B Remand*

¶29    Camara appealed, challenging his convictions on several grounds. Camara also filed a motion for a remand under rule 23B of the Utah Rules of Appellate Procedure, asking this court to remand to the district court to create a record regarding seven additional claims of ineffective assistance. Following oral argument, we issued an order granting Camara's request for a remand as to some (though not all) of these claims. After an evidentiary hearing, the district court entered findings of fact addressing the claims for which this court had remanded.

ISSUES AND STANDARDS OF REVIEW

¶30    Camara raises several issues on appeal. For the reasons set forth below, we address three of them.

¶31    First, Camara argues that the district court abused its discretion by not dismissing the case as a "sanction" for the State's actions relating to Expert's computer. We review a district court's decision on whether to dismiss a case as a discovery sanction for abuse of discretion. *See Chard v. Chard*, 2019 UT App 209, ¶ 30, 456 P.3d 776; *see also Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶ 9, 370 P.3d 963. When an underlying issue presents "a mixed question of law and fact," "we review the court's factual findings for clear error, and we review its legal conclusions, including its application of law to the facts of the case, for correctness." *State v. Hebeishy*, 2022 UT App 136, ¶ 12, 522 P.3d 952.

¶32 Second, Camara argues that the district court abused its discretion by denying his motion for a mistrial based on jurors hearing comments from the gallery. "We review the denial of a mistrial motion for abuse of discretion." *State v. Bermejo*, 2020 UT App 142, ¶ 20, 476 P.3d 148. To the extent that this analysis implicates Camara's constitutional right to trial by an impartial jury, the "interpretation of the Utah Constitution is a question of law that we review for correctness." *State v. Soto*, 2022 UT 26, ¶ 13, 513 P.3d 684 (quotation simplified).

¶33 Finally, Camara argues that he received ineffective assistance because Counsel did not file a motion for a directed verdict on several counts. Because this is raised for the first time on appeal and there is no lower court ruling to review, we decide this issue as a matter of law. *See State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416.

ANALYSIS

I. Motions to Dismiss

¶34 On appeal, Camara first challenges the district court's decision not to dismiss the case as a sanction for the State having made a copy of Expert's files and, in his view, "access[ing]" them. As he did below, Camara argues that the State's actions violated both his Sixth Amendment rights and various rules of procedure relating to discovery.

¶35 With respect to his Sixth Amendment claim, Camara relies heavily on *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995). There, the Tenth Circuit held that "a prosecutor's intentional intrusion into the attorney-client relationship constitutes . . . a *per se* violation of the Sixth Amendment" under which prejudice "must be presumed." *Id.* at 1142. Camara asks us to adopt that rule. And with the proposed presumption of prejudice as the backdrop, Camara argues that it was an abuse of discretion for the court to not dismiss the case. In his view, the "sanctions" imposed

by the court "did not resolve the underlying damage caused by the State's actions" and "the only appropriate remedy was dismissal." With respect to his rules-based claim, Camara likewise argues that the court abused its discretion by not imposing an adequate sanction. We disagree.[10]

¶36  Starting with the constitutional claim, we note that *Shillinger*'s adoption of a presumption of prejudice was recently overruled by the Tenth Circuit. *See United States v. Hohn*, 123 F.4th 1084 (10th Cir. 2024) (en banc), *cert. denied*, No. 24-1084, 2025 WL 2906501 (U.S. Oct. 14, 2025). There, the en banc Tenth Circuit held "that a Sixth Amendment violation of the right to confidential communication with an attorney requires the defendant to show prejudice." *Id.* at 1088. And the court expressed its view that *Shillinger* had "misinterpreted" and "misappli[ed]" certain "Supreme Court precedents" in holding to the contrary. *Id.* at 1102, 1105–06.

¶37  The precedents bear this out. In *Weatherford v. Bursey*, the United States Supreme Court reversed the Fourth Circuit's conclusion that a presumption of prejudice applies "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship." 429 U.S. 545, 549–51 (1977) (quotation simplified). The Court instead held that unless there is "at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation." *Id.* at 558; *see also* 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.8(b) (4th ed. 2024) (explaining that *Weatherford* involved "an invasion of the lawyer-client relationship that had a significant investigative justification," and it "makes clear that such an invasion will not be deemed to violate the Sixth Amendment in the absence of a realistic likelihood of having adversely impacted the defense at trial"). And in *United States v. Morrison*, the

---

10. As noted, Camara filed two motions to dismiss relating to the external hard drive. On appeal, Camara says that he is challenging the denial of both motions.

Supreme Court reversed the dismissal of an indictment based on an alleged Sixth Amendment violation, explaining that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." 449 U.S. 361, 363–65 (1981); *see also* 3 LaFave et al., *Criminal Procedure* § 11.8(b) (explaining that *Morrison* has been understood to require a showing of prejudice for even an "unjustified invasion," so "only prejudice that is indelible and holds open the possibility of an unjust conviction would justify [a] dismissal with prejudice").

¶38 In light of these authorities, we disagree with Camara's suggestion that, just because the State obtained a copy of Expert's files, a presumption of prejudice applied. Instead, under precedent from the Supreme Court, Camara still needs to show that the alleged violation of his Sixth Amendment rights prejudiced him.

¶39 This leads to the question of whether the district court acted within its discretion in declining to order the dismissal of the case. On this front, we note that, even with the presumption of prejudice, *Shillinger* held that dismissal of the case is only appropriate "in extreme circumstances." 70 F.3d at 1143. And this general reluctance to order dismissal in such circumstances comports with the approach taken by other courts. For example, the United States Supreme Court has held that "the remedy characteristically imposed" for a Sixth Amendment violation "is not to dismiss the indictment but to suppress the evidence" that was unlawfully obtained or instead "order a new trial if the evidence has been wrongfully admitted and the defendant convicted." *Morrison*, 449 U.S. at 365. The Court has also held that Sixth Amendment "remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Id.* at 364. In another more recent case, the Court held that "a remedy must neutralize the taint of a constitutional violation, while at the same time not grant a windfall to the defendant or needlessly squander

the considerable resources the State properly invested in the criminal prosecution." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (quotation simplified).

¶40 As discussed, the district court in this case held two evidentiary hearings to determine what had happened. From the evidence developed at those hearings, the court ruled that the State had indeed acted improperly by making a copy of Expert's files. But even so, the court ultimately found after the second hearing that there was "no evidence that any work product was accessed" by the State, "no evidence that any attorney-client communications [had] been improperly disclosed," "no appreciable impact on the defendant's right to effective assistance of counsel," and "[n]o ongoing prejudice to the defendant's case." Having reviewed the record, we see no basis for overturning those findings.

¶41 Without any evidence that the State had accessed any confidential information, the district court then had discretion to fashion a remedy that was "appropriate in the circumstances," *Morrison*, 449 U.S. at 365, even if that remedy was something short of outright dismissal. And this is what the court did. As noted, the State agreed in the course of these proceedings to not "present any affirmative evidence . . . arising from its possession or analysis of the extraction performed on [Camara's] cellular phone by [Expert]," and the court ordered the State before trial to "destroy the copy of the hard drive" that it had obtained. On appeal, Camara points to no evidence that the State used or offered at trial that was obtained from Expert's computer. Thus, it seems that the court's orders and the State's agreement collectively deprived the State of any benefit from the illegality, while still allowing the case to proceed. This was an appropriate exercise of the court's discretion.

¶42 Camara nevertheless points out that, even "without finding a Sixth Amendment violation, the district court had discretion to dismiss the case" under rule 25 of the Utah Rules of

Criminal Procedure. That rule provides that, "[i]n its discretion, for substantial cause and in furtherance of justice, the court may . . . order an information or indictment dismissed." Utah R. Crim. P. 25(a). But this court has explained that, under this rule, "dismissals grounded solely on prosecutorial misconduct are rarely appropriate." *State v. LoPrinzi*, 2014 UT App 256, ¶ 9, 338 P.3d 253 (quotation simplified).

¶43 While this rule contemplates that a party *may* be sanctioned, it places the choice of sanction within the discretion of the district court. And again, the district court chose to sanction the State by preventing it from using any evidence obtained through the seizure of files from Expert's computer. In these circumstances, we see no basis for concluding that the court abused its discretion by not going further and dismissing the case.

## II. Mistrial Motion[11]

¶44 Camara next claims that the district court abused its discretion when it denied his motion for a mistrial based on outside juror contacts. In Camara's view, those contacts violated his right to an impartial jury as provided by both the United States and Utah Constitutions. Camara thus argues the district court should have applied a presumption of prejudice under the terms set forth in *State v. Soto*, 2022 UT 26, 513 P.3d 684. The State disagrees, contending that the presumption of prejudice does not apply.

¶45 In the separate opinion, the majority concludes that the presumption of prejudice does apply, and it accordingly reverses and remands for the district court to determine whether the presumption was rebutted. Contrary to the views set forth in the

---

11. As indicated, the separate opinion represents the controlling opinion of this court on this issue. The views set forth in this Part II are Judge Tenney's alone and constitute the dissent as to this issue.

separate opinion, I don't believe that this case triggers a presumption of prejudice under *Soto*. I would instead review the court's decision under ordinary mistrial principles, and under those principles, I would affirm the denial of Camara's motion.[12]

A.      Juror 7 Was Not Exposed to an Outside Contact

¶46    Article I, Section 12 of the Utah Constitution guarantees a criminal defendant the right to trial "by an impartial jury." This right "prohibits undue outside influence on the jury at any point between the jury's empanelment and the rendering of judgment," because "certain outside communications are so apt to consciously or unconsciously influence the judgment of the juror as to likely violate the guarantee of an impartial jury," *Soto*, 2022 UT 26, ¶¶ 18, 25 (quotation simplified).[13]

---

12. I agree with the separate opinion that although *State v. Soto*, 2022 UT 26, 513 P.3d 684, was issued after Camara's trial, it's appropriate to assume that *Soto* applies to this appeal. I also recognize that the interpretations of *Soto* advanced in the two opinions in this appeal differ in some respects from the interpretations offered by the parties in their respective briefs. But the question of what *Soto* means and how it should be applied to the facts of this case was fully briefed and argued by both sides, so, like the separate opinion, I see nothing amiss about the judges on this panel doing their best to set forth a faithful reading of it. Finally, I agree with the separate opinion that, because Jurors 9 and 10 were alternates and were excused before deliberations, the *Soto* analysis in this case should focus on Juror 7.

13. *Soto* recognized that the "United States Constitution provides the same protection," but it then explained that while it would cite some federal cases as persuasive authority, it would ultimately ground its analysis in the state constitutional right. 2022 UT 26, ¶¶ 14, 20–21.

¶47    Reviewing *Soto*, it seems to me that the case poses something of a threshold question: whether there has been an "outside influence," "outside communication[]," or "improper . . . contact" with the jury. *Id.* ¶¶ 18, 25, 32. (For simplicity, I'll refer to such an occurrence as an "outside contact" moving forward.) The supreme court in *Soto* held that if it's shown that there was an outside contact with a juror, a court should then use a "balancing test" to determine whether the presumption of prejudice should apply. *Id.* ¶ 39. This balancing test "considers *who* said *what* and the *circumstances* surrounding the contact." *Id.* (emphases in original). If the court concludes that prejudice should be presumed under this three-part test, the burden is then "on the prosecution to prove that the unauthorized contact did not influence the juror." *Id.* ¶ 32 (quotation simplified).[14]

---

14. The separate opinion repeatedly couches its analysis in terms of whether there was an "unauthorized contact." As will be clear soon enough, I disagree with the separate opinion's conclusion that what matters here is whether the contact was authorized by the rules of evidence or courtroom procedure. But I think it important to note that I do agree with the separate opinion that, under the terms set forth in *Soto*, an initial "contact" of some sort must occur to trigger the three-part test that is then used to determine whether the presumption of prejudice applies. Were it otherwise, it would seem that this three-part test would be applicable whenever anything objectionable was said, even if it was said on the stand during witness testimony, which could potentially upend ordinary mistrial processes entirely. So to get a case into *Soto*-territory, it seems that there must be some initial triggering contact. The difference between my opinion and the separate opinion isn't whether this is so; rather, it's what that contact looks like.

    As I explain below, I think that in most cases, what matters is whether that contact occurred outside the courtroom. I'll go ahead and note here that *Soto* could at least arguably be read as

(continued…)

¶48 I don't believe that there was an outside contact in this case for purposes of the *Soto* test. And as an initial matter, I note that the word "outside" carries outsized importance in *Soto*. The majority opinion used that word twenty-two times, and it relatedly referred to contacts from "outsiders" three more times. So this begs the question: outside of *what*?

¶49 In an ordinary sense, I think that most people would instinctively assume that an "outside contact" with jurors who are sitting in a trial would refer to a contact that happened outside the trial—and, indeed, outside the courtroom. As it turns out, that's exactly how *Soto* and the past Utah cases that it relied on tend to use that term. Looking at *Soto* and its supporting Utah cases, I think it's significant that in almost every case, the communications at issue happened outside the courtroom. *See, e.g., id.* ¶¶ 84–85 (applying a presumption of prejudice based on a conversation that occurred in an elevator between a bailiff, a court IT technician, and jurors); *State v. Erickson*, 749 P.2d 620, 620–21 (Utah 1987) (applying a presumption of prejudice where a juror had a "four or five minute[]" conversation with "a key witness" "in the hall outside the courtroom" "during [a] recess"); *State v. Pike*, 712 P.2d 277, 280–81 (Utah 1985) (applying a presumption of prejudice where "an important prosecution witness . . . engaged in conversation in the hall of the courthouse during a recess with three jurors regarding a personal incident"); *State v. Anderson*, 237 P. 941, 944 (Utah 1925) (applying a presumption of prejudice where a juror rode to and from court with a witness throughout a three-week trial); *State v. Thorne*, 117 P. 58, 66 (Utah 1911)

---

treating this as something that should be folded into the third part of its test (which, as will be discussed, looks to "special circumstances"). If this is what *Soto* intended, I would reach the same result in this appeal by concluding that this circumstance (i.e., that the contacts in question occurred inside the courtroom) is dispositive as to whether a presumption of prejudice should apply in this case, and I would do so for largely the same reasons that I set forth below in the remainder of my opinion on this issue.

(applying a presumption of prejudice where a juror left his lunch table during deliberations and went with an officer of the court to another part of the building, where he spoke on the phone to someone else).

¶50　This pattern comports with what I think the phrase "outside contact" with jurors would naturally mean. And there's also some logic to drawing the line here. In one key passage, *Soto* stated that the reason a presumption of prejudice might attach when there has been an outside contact with jurors is that it can be "difficult, if not impossible," at that point "to prove how [the] improper contact may have influenced a juror." 2022 UT 26, ¶ 36 (quotation simplified). In this sense, *Soto* seems to have viewed this as a problem of proof. But as the State pointed out at oral argument in this appeal, when a contact occurs inside the courtroom (even if it occurs off the record), that contact has happened within a decidedly controlled environment. Even if the judge did not personally observe or hear the contact, the judge can still readily determine with precision exactly who was where, who said what, and who heard what. Everyone in the room can be promptly subjected to on-the-record questioning from the court, and the encounter will in most instances be supported by audio and visual evidence. Put simply, the moment one gets outside the courtroom itself, any number of variables are introduced into the mix, which is why I think the place of the contact matters (or, at least, has mattered in *Soto* and most of the Utah cases it relied on).

¶51　Reviewing the Utah cases cited by *Soto* that applied a presumption of prejudice, I do see two that involved communications between jurors and outsiders that may have occurred in the courtroom. In *State v. Swain*, we applied a presumption of prejudice where defense counsel noticed that, during a "short recess," one of the jurors approached one of the State's witnesses, at which point the juror and the witness had a conversation about their upcoming high school reunion. 835 P.2d 1009, 1010–11 (Utah Ct. App. 1992). And in *Logan City v. Carlsen*,

we also applied a presumption of prejudice where the defendant overheard a bailiff "discussing sentencing and jurisdiction with the jury" "during a recess." 799 P.2d 224, 225–27 (Utah Ct. App. 1990). So far as I can tell, neither decision explicitly says that the conversations occurred outside the courtroom, and depending on the layout of the respective courthouses, it may have been possible that they did occur outside the courtroom. But it seems reasonable to assume that either or perhaps both of these encounters occurred in the courtroom, given that the defense attorney in *Swain* and the defendant in *Carlsen* might not have been in position to have overheard the relevant conversations if the jury had been taken out of the courtroom and back to a secluded place.

¶52    But even if it is true that *Swain* and *Carlsen* involved communications that occurred in the courtroom (which, again, is at least a touch unclear), I think it's significant that both of these cases involved direct conversations between jurors and outsiders. Indeed, as the State points out in its brief, the past Utah cases that have applied a presumption of prejudice have all involved situations where there was "direct extra-judicial communication" between jurors and outsiders. And as indicated by the parentheticals attached to the string cite above, *Soto* and its supporting Utah cases typically involved not just communications that occurred outside the courtroom, but also direct communications between jurors and outsiders.[15]

---

15. Indeed, in *State v. Norton*, the Utah Supreme Court seemed to apply ordinary mistrial rules even though there had been a direct conversation between an outsider and jurors. 675 P.2d 577, 582 (Utah 1983), *overruled on other grounds by State v. Hansen*, 734 P.2d 421 (Utah 1986), *and abrogated on other grounds by State v. Guard*, 2015 UT 96, 371 P.3d 1. There, "an elderly man approached a member of the jury" during a recess of a capital murder trial and "said in a loud voice, 'I made up my mind a long time ago; any

(continued…)

¶53 But what happened here does not fit this pattern. As noted, the conversation that Juror 7 overheard happened in court, not outside of court. And it didn't involve a direct communication between an outsider and a juror. Rather, Juror 7 simply overheard a portion of a conversation that two other people were having in the gallery. This case therefore falls outside the parameters of the cases relied on by *Soto*.[16]

---

time a guy walks in a bank and shoots two people, he deserves to die.'" *Id.* On appeal, the supreme court affirmed the denial of a mistrial motion that was based on this encounter, and the supreme court did so without purporting to apply a presumption of prejudice. *See id.* Instead, the court simply said that, "after reviewing the record," it was "convinced that this event caused no prejudice to the defendant and that the [district] court handled the matter appropriately." *Id.* (quotation simplified).

16. To be clear, *Soto* does say that the presumption of prejudice can apply when there has been "*inadvertent* conduct and communications directed at a juror." 2022 UT 26, ¶ 33 n.7 (emphasis added). But *Soto* didn't give an example of what kind of "inadvertent" communication would qualify, and I'm not totally sure how a communication could be both "inadvertent" *and* "directed at a juror." In my mind, "inadvertent" suggests something accidental, while "directed at" suggests something intentional. Given the nature of the authorities relied on by *Soto*—which, as noted, were overwhelmingly based on communications that occurred outside the courtroom—what I think *Soto* is suggesting in this passage is that if an outsider inadvertently communicates with jurors outside the courtroom, a presumption of prejudice can apply, whereas a more direct conversation between a juror and an outsider that occurs in court could suffice as well. But on this, further guidance from the supreme court—whether it be in this appeal or some other appeal—would certainly be helpful.

¶54    True, we're a common law court, and case-by-case legal development is indeed part of our system. So even though *Soto* didn't contemplate this exact scenario, we certainly could conclude that it is covered by *Soto*'s general principles. And here, the separate opinion concludes that, based on the principles set forth in *Soto*, the overheard conversation should qualify because it was "unauthorized," meaning that it was "off the record."

¶55    Unlike the separate opinion, I would not draw the line in that place. Before explaining why, let me say up front that I don't believe that *Soto* or any past Utah decision clearly answers this question. As a result, while my colleagues and I see this differently, I see this as a good faith disagreement about a novel question. Regardless, I'm not persuaded that we should extend *Soto* past the terms set forth in that case or the prior Utah cases, that rule 47(*l*) of the Utah Rules of Civil Procedure compels us to do so, or that doing so is necessary to protect the interests underlying the right in question, and I'm further concerned about the implications of the separate opinion on future cases.

¶56    First, as explained, neither *Soto* nor the past Utah cases that applied a presumption of prejudice involved jurors overhearing or seeing something that happened in court during trial proceedings. Indeed, at oral argument in this appeal, Camara's appellate counsel was asked if she was aware of any past Utah case in which the appellate courts had applied the presumption of prejudice to a situation where "something . . . happened in front of the jurors during the trial itself, as opposed to outside of the trial," and Camara's appellate counsel could not point to any such case. I'm not aware of any such case either.

¶57    But in *State v. Cardall*, 1999 UT 51, 982 P.2d 79, our supreme court expressed some wariness about extending this particular rule to new scenarios. There, the defendant asserted that the presumption of prejudice should apply because jurors had observed an interaction that occurred during a recess between the victim and her mother on the stand. *Id.* ¶¶ 12, 22. But the supreme

court rejected this assertion, in part, because the defendant had "failed to cite any Utah case which holds that incidents like the witness stand incident invoke a presumption of prejudice." *Id.* ¶ 22. By extending the presumption of prejudice to an overheard conversation that happened in court during the trial, however, the separate opinion is taking *Soto* to a place that neither *Soto* nor any past Utah case has previously gone. *Cardall* suggests that we should be wary of doing so.

¶58 Second, the separate opinion places great weight on the fact that rule 47(*l*) of the Utah Rules of Civil Procedure prohibits "off-the-record communication between jurors and lawyers, parties, witnesses or persons acting on their behalf." In the separate opinion's telling, "all five justices agreed that off-the-record contact . . . implicates the presumption of prejudice." But I find that hard to square with what the *Soto* majority actually said.

¶59 The *Soto* majority noted that the *Soto* dissent had "relie[d] on Utah Rule of Civil Procedure 47(*l*) in its analysis." 2022 UT 26, ¶ 58. The *Soto* majority then stated that "while our rules provide useful guidelines for juror behavior, they do not and cannot supplant our case law interpreting the breadth of the constitutional right to trial by an impartial jury." *Id.* (quotation simplified). Continuing, the majority said, "Fortunately, rule 47(*l*)'s limitations on outside communications are broader than our constitutional limits and thus create no constitutional problems." *Id.* ¶ 59. The majority noted that rule 47(*l*) "prescribes a noble standard of juror behavior, but it does not tell us when a court must presume prejudice from such communication"; instead, in the majority's view, the "answer" to "that question" must be drawn from "our case law." *Id.* Wrapping things up, the majority insisted that "the dissent's reliance on rule 47(*l*) [was] misplaced," and it instead said that "[w]hen deciding whether a juror contact with an outsider triggers the rebuttable presumption of prejudice, we do not apply rule 47(*l*)." *Id.* ¶ 61.

¶60 Despite all this, the separate opinion seems to assume that while the *Soto* majority did not think that rule 47(*l*) should be used as part of the three-part test, rule 47(*l*) should be used when assessing the initial question of whether there was an impermissible "contact." But if this is what the *Soto* majority meant, it certainly didn't say that. This seems to me to be a meaningful omission. Indeed, I also think it significant that with one exception, the only references to rule 47(*l*) in the *Soto* majority at all are in paragraphs 58 to 61, which, as evidenced by the statements I've just catalogued, are part of a discussion of why rule 47(*l*) is *inapplicable* to the constitutional question that was before the court.[17] And again, as part of the discussion in paragraphs 58 to 61, the *Soto* majority insisted that rule 47(*l*) could not "supplant" prior case law "interpreting the breadth of the constitutional right to trial by an impartial jury." *Id.* ¶ 58 (quotation simplified). Given that framing, it seems odd to me to suggest that the initial question of whether a triggering "contact" occurred—which, in my mind, would be part of the same constitutional question—is governed by a rule of procedure, rather than the prior cases that interpreted the scope of the same constitutional right in question.[18]

---

17. The one additional reference to rule 47(*l*) is found in *Soto*, 2022 UT 26, ¶ 14 n.3. There, the majority expressed its view that the "rules of procedure" "can only add to and never diminish or supplant our constitutional requirements of a criminal defendant's right to trial by an impartial jury." *Id.* (quotation simplified). In my mind, this reiterates that the majority saw rule 47(*l*) as being distinct from the constitutional right in question.

18. Moreover, as I mentioned above, in *Norton*, the Utah Supreme Court considered a case in which there was an inflammatory statement made to jurors that was very clearly made "off the record" as that phrase has been defined by the separate opinion in this appeal. *See* 675 P.2d at 582. And yet even so, on appeal, the

(continued…)

¶61 In short, given the language used by the *Soto* majority and the development of our cases, I'm not persuaded by the separate opinion's assertion that rule 47(*l*)'s on-the-record/off-the-record distinction is controlling here in this constitutional case.

¶62 Third, I recognize that *Soto* suggests in a few places that what matters is that the jury should not be tainted by receiving improper information. *See, e.g., id.* ¶ 27 (suggesting that what's important is ensuring that the jury's consideration is limited to evidence developed on "the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]" (quotation simplified)); *id.* ¶ 30 (suggesting that what's important is preventing the jury from "being polluted by influences other than that which are produced by the legal evidence and the law governing the case" (quotation simplified)). And I readily agree that, to the fullest extent possible, jurors should be kept free from outside taint.

¶63 But even so, I'm not sure that the on-the-record/off-the-record line is the one that our past cases have drawn when it comes to the question of whether a defendant's constitutional right to a fair trial has been violated. Indeed, our supreme court's decision in *Cardall* suggests otherwise. Again, the supreme court there considered a case in which jurors observed an interaction between the victim and her mother that occurred during a recess and outside the presence of the judge, *see Cardall*, 1999 UT 51, ¶¶ 12–13, so it would presumably qualify as an off-the-record moment. And yet on appeal, the supreme court held that this did not trigger a presumption of prejudice because there had been "no

---

supreme court affirmed the denial of a mistrial motion without highlighting the fact that the communication was off-the-record or purporting to apply a presumption of prejudice. *See id.* If what's actually driving the analysis at this initial step is whether there was an off-the-record communication, it seems that *Norton*'s analysis would have been couched in very different terms.

conversation between witnesses and jurors, just a quiet exchange between [the victim] and her mother." *Id.* ¶ 21.

¶64 Perhaps more importantly, viewing the problem from a systemic perspective, I don't think that a presumption of prejudice needs to apply whenever there's the possibility that jurors may have been tainted by hearing or seeing something that they shouldn't have heard or seen. After all, whenever a witness says something on the stand and a court then sustains an objection to that statement after the fact, the jury has heard something that it shouldn't have heard. But when that happens, the ordinary course of things is for the court to instruct jurors to disregard what they heard and then move on.

¶65 And this is where the ordinary mistrial standard comes into play. If the improper testimony was bad enough, an adversely affected party can move for a mistrial. If a party files such a motion, a mistrial "should be granted only where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Sorenson*, 2023 UT App 159, ¶ 21, 542 P.3d 529 (quotation simplified). In any number of cases, Utah's appellate courts have applied this ordinary standard (i.e., without also applying a presumption of prejudice) to determine whether the defendant could still receive a fair trial even though the jury heard something it shouldn't have heard. To pick just a few, these include cases in which jurors heard that that the defendant in a drug prosecution owed $2,400 to "the State Narcotics and Provo City Police Department," *State v. Creviston*, 646 P.2d 750, 753 (Utah 1982) (quotation simplified); that one of the alleged victims of sex abuse had recently attempted suicide based on her anguish about the alleged abuse, *see State v. Meraz-Zamorano*, 2025 UT App 110, ¶ 41, 575 P.3d 271, *petition for cert. filed*, July 29, 2025 (No. 20250846); that the defendant in an assault prosecution had been involved in "a similar situation several years earlier," *State v. Graydon*, 2023 UT App 4, ¶ 59, 524 P.3d 1034 (quotation simplified); that, at the time of the alleged offense, the defendant

was "'out' of jail 'on [an] ankle monitor,'" *State v. Whytock*, 2020 UT App 107, ¶¶ 15–24, 469 P.3d 1150; that the defendant had invoked his right to remain silent after being arrested, *see State v. Sosa-Hurtado*, 2018 UT App 35, ¶¶ 55–58, 424 P.3d 948, *aff'd*, 2019 UT 65, 455 P.3d 63; and that the defendant had a history of "getting violent" with the victim, *State v. Yalowski*, 2017 UT App 177, ¶¶ 17–22, 404 P.3d 53.

¶66 True, what happened in this case involved a juror hearing something from someone who wasn't on the stand. This is a difference, but I'm not persuaded that it's a meaningful difference, much less one that transforms something that was objectionable into a problem of constitutional dimension. If Bree (or, somehow, her attorney) had said the same exact thing or even something more inflammatory from the stand instead of from the gallery, no one would blink an eye at evaluating the effects of that statement on jurors through the ordinary mistrial rule. I don't see why, as a functional matter, the fact that this was said from the gallery makes this so different that an entirely different rubric should now apply. If the ordinary mistrial standard is sufficient to protect a defendant's right to a fair trial when something improper is said on the stand, I'm not sure why it's inadequate to protect that same right if something improper is said from the gallery.

¶67 Again, the parties have not pointed to any past Utah case that evaluated a mistrial motion that was based on something that a juror heard or observed that happened in the gallery, much less in the gallery while the trial was proceeding. But looking elsewhere, I see several cases in which other courts used ordinary mistrial rules (i.e., without applying a presumption of prejudice) when something happened in the gallery. *See, e.g., Kinnamon v. Scott*, 40 F.3d 731, 734 (5th Cir. 1994) (per curiam) (rejecting a claim that there was a "denial of due process" where the victim's daughter "entered the courtroom" during a recess and "began screaming that [the defendant] had killed her father," with the Fifth Circuit concluding that no "prejudicial error of

constitutional magnitude" occurred); *Bruce v. Duckworth*, 659 F.2d 776, 781–82 (7th Cir. 1981) (declining to apply a presumption of prejudice where "a juror informed the court that the jury 'could hear discussion going on in the audience,'" because "[a]ny audience discussion that occurred was in the presence of the trial judge and the parties in open court" and the "trial judge acted swiftly to put an end to the problem"); *State v. Stephenson*, No. 22-2082, 2024 WL 2317492, at *5–6 (Iowa Ct. App. May 22, 2024) (affirming denial of a mistrial motion under ordinary mistrial principles where someone "made comments from the courtroom gallery," which the defendant's counsel asserted that the jury heard); *State v. Quinones*, No. 98,877, 2009 WL 311812, at *3–8 (Kan. Ct. App. Feb. 6, 2009) (per curiam) (affirming denial of a mistrial motion under ordinary mistrial principles where gallery members made "threatening gestures" during a confidential informant's testimony that were observed by the bailiff and the jury); *State v. Triebwasser*, No. 97,703, 2008 WL 2423368, at *2–5 (Kan. Ct. App. June 13, 2008) (per curiam) (affirming denial of a mistrial motion under ordinary mistrial principles where someone from the gallery commented, "That's not true" during the defendant's testimony); *State v. Allen*, 276 So. 2d 868, 871–72 (La. 1973) (affirming denial of a mistrial motion under ordinary mistrial principles after several jurors overheard "comments of [a] corroborative nature from the spectators, the exact words of which the reporter was unable to discern" (quotation simplified)); *State v. Thompson*, 378 So. 3d 784, 787–89 (La. Ct. App. 2023) (affirming a denial of a mistrial under ordinary mistrial principles where two spectators wore "shirts displaying a photo of the victim and the phrase 'Justice for [the victim]'"); *State v. Holman*, 570 S.W.3d 157, 160–62 (Mo. Ct. App. 2019) (affirming the denial of a mistrial motion under ordinary mistrial principles "after [the victim's] daughter lunged toward [the defendant's] counsel table and said either, '[L]et me at him,' or, 'I'm going to get him'"); *State v. Dukes*, No. 37324–6–II, 2009 WL 597277, at *5–7 (Wash. Ct. App. Mar. 10, 2009) (affirming denial of a mistrial motion under ordinary mistrial principles where someone from the gallery

called out, "You don't have to be scared" during a witness's testimony).

¶68 And this leads to my final point, which is that I'm concerned about the potential implications of extending the presumption of prejudice to this kind of scenario. *Soto* said that if the presumption of prejudice applies, the State can only overcome that presumption by "proving that the contact was harmless beyond a reasonable doubt." 2022 UT 26, ¶ 87. *Soto* referred to this as a "heavy" burden. *Id.* ¶ 89. *Soto* suggested that the ordinary processes of questioning the jurors and receiving "averments as to their own lack of bias" would not be sufficient to overcome the presumption, nor would "a curative instruction alone." *Id.* ¶ 95. Instead, *Soto* contemplated a much more involved process involving testimony from the "third-party communicators as testimonial witnesses whom the defendant can confront and cross-examine" or instead one that requires the State to establish "that its evidence of the defendant's guilt was so strong that the improper contacts made no difference in the jury's verdict." *Id.* ¶¶ 96, 98. Thus, in many cases (including potentially this one), the question of whether the presumption of prejudice applies could be a case-altering question.

¶69 By holding that this presumption can be triggered by something that's said in the gallery during the trial, I'm worried that the presumption may now apply more often than *Soto* intended or is necessary to protect a defendant's right to a fair trial. I'm worried that this opens the door for outright mischief or, at least, unnecessary reversals and retrials based on occurrences that weren't nefarious by design. After all, trials are open to the public, and given the high emotional stakes involved in many trials, it's not hard to imagine someone saying something that they shouldn't say. In my mind, if something improper is said from the gallery during the trial, a court should be empowered to do what it would ordinarily do when something improper is said during the trial—instruct the jury to disregard the statement and then evaluate any mistrial motion under ordinary principles.

¶70 In short, unlike the separate opinion, I'm not persuaded that when *Soto* referred to "outside" or even "unauthorized" contacts or influences, it meant to include things that were said in the gallery during the trial that jurors overheard. I would accordingly hold that the initial predicate for *Soto*'s three-part test did not exist in this case. Because of that, I would hold that the presumption of prejudice does not apply.[19]

---

19. The separate opinion surmises that the "logic" of my opinion "would erase *Soto*—and all presumption of prejudice cases—from the books." With respect, this is hyperbole that's also untrue. As I've explained, the throughline that runs through *Soto* and most of the past Utah cases in this area is that there was a contact between jurors and someone else outside the courtroom. In two cases, we also applied the presumption of prejudice to direct communications that, though unclear from the opinions themselves, may have occurred inside the courtroom. *See State v. Swain*, 835 P.2d 1009, 1010–11 (Utah Ct. App. 1992); *Logan City v. Carlsen*, 799 P.2d 224, 225–27 (Utah Ct. App. 1990). My approach fully accepts those cases and applies them on their stated terms, so I'm not quite sure how my approach can fairly be said to have "erased" them.

The separate opinion's insistence to the contrary is based on its belief that it would be "somewhat arbitrary" to primarily focus on whether a communication occurred outside the courtroom. But as I've explained, I think that there is a reason for drawing that line—namely, it's reflective of a problem of proof. In any event, the approach taken by the separate opinion has arbitrariness problems of its own. For example, under the separate opinion's approach, if a witness blurts out, "She's a liar!" from the stand, the result might be an objection or even a mistrial motion; but if the same witness is excused from the stand and is then overheard muttering to herself, "She's a liar," as she walks out of the courtroom, this would suddenly transform the matter into an entirely different problem that now has constitutional

(continued…)

B.      Applying Ordinary Mistrial Principles, I Would Affirm the District Court's Denial of Camara's Motion

¶71      "We review the denial of a motion for a mistrial under an abuse of discretion standard, and we will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Kufrin*, 2024 UT App 86, ¶ 33, 551 P.3d 416 (quotation simplified). This is because a "mistrial is strong medicine." *Whytock*, 2020 UT App 107, ¶ 16; *see also State v. Roberts*, 2019 UT App 9, ¶ 15, 438 P.3d 885 ("Declaring a mistrial is a particularly drastic remedy that is warranted only when no reasonable alternatives exist." (quotation simplified)). Appellate courts accordingly "afford a high level of deference to a trial court's decision" on such a motion "because trial courts are in an advantaged position to determine the impact of courtroom events on the total proceedings." *Kufrin*, 2024 UT App 86, ¶ 37 (quotation simplified). "Additionally, our appellate courts have considered the district court's offers to cure any alleged harm and trial counsel's response in evaluating whether the court's mistrial

---

implications. If drawing the line at the courtroom door is arbitrary, drawing it at the foot of the witness box seems arbitrary too.

Regardless, it seems to me that the lack of clarity on all this may well be attributable to the fact that the past Utah cases in this area were uniformly focused on the question of how prejudicial a triggering contact really was, rather than the question presented here of what it even means, for constitutional purposes, to have an outside or unauthorized contact at all. Again, I regard the differing opinions in this appeal to be good faith attempts to answer a question that *Soto* and its progenitors were not called upon to directly consider. Whether it be in this case or some future case, it would be helpful for our supreme court to give further guidance on this important question.

motion decision was an abuse of discretion." *State v. Bermejo*, 2020 UT App 142, ¶ 77, 476 P.3d 148.

¶72 On this record, I see no basis for concluding that the district court abused its discretion. As indicated, after the court was advised that some jurors had overheard some conversation from the gallery, the court questioned each of the jurors separately about what they had heard. During this questioning, Juror 7 informed the court that (s)he had overheard some indistinct chatter, during which (s)he had more specifically heard either Bree or the person "she was talking to" say, "[S]he's lying" during Wife's testimony. But Juror 7 then confirmed that (s)he was not "influenced" by the statement and that (s)he could "focus on what was said . . . from the stand." After Counsel moved for a mistrial the next day, the court denied that motion based on its conclusion that there had been no meaningful "articulation of prejudice." And as noted, the court had previously "instruct[ed] the jurors that any comments that they may hear from the gallery are not testimony, are not evidence, [and] are not to be considered as such."

¶73 In these circumstances, I think the district court did everything right. The court found out who had heard what and from whom and then received assurances that the juror in question would not be influenced by what (s)he had heard. And as noted, the court had already instructed jurors that statements made by people not on the stand were not evidence. Moreover, to the extent that mistrial motions turn on the likelihood of prejudice, I also think it's significant that, while it was clearly improper for Bree or her attorney to have said what was said, the extra information that Juror 7 heard was both brief and unsurprising. According to Juror 7's account—which we have no reason to disbelieve—the only specific thing that (s)he heard was that either Bree or the woman next to her said, "[S]he's lying" about something Wife said that was defense-favorable. But no one would be surprised that Bree or a close companion would disagree with defense-favorable testimony. In *Kinnamon*, the Fifth

Circuit rejected a similar claim, in part, because the outburst in question had "communicated nothing new to the jury." 40 F.3d at 734. The same is true here too.

¶74    For these reasons, I'm not persuaded that the isolated comment that Juror 7 overheard was so meaningful that, under the ordinary mistrial rule, the court had no choice but to grant a mistrial. I would therefore affirm the denial of the mistrial motion on that basis.

### III. Ineffective Assistance and Motion for a Directed Verdict

¶75    Camara next argues that he received ineffective assistance because Counsel did not move for a directed verdict on several counts.

¶76    To prevail, Camara must prove that (1) "[C]ounsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Camara "must establish both prongs," and "if either is lacking, the claim fails and this court need not address the other." *State v. Ames*, 2024 UT App 30, ¶ 17, 546 P.3d 356 (quotation simplified), *cert. denied*, 550 P.3d 993 (Utah 2024). To establish deficient performance, Camara "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation simplified). Counsel's "decision not to pursue a futile motion is almost always a sound trial strategy" and therefore "does not constitute deficient performance." *State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 (quotation simplified). To establish prejudice, Camara "must show that there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ames*, 2024 UT App 30, ¶ 19 (quotation simplified).

¶77    The question here is whether Counsel should have filed a motion for a directed verdict. Under rule 17 of the Utah Rules of

Criminal Procedure, a motion for a directed verdict may be granted when "the evidence is not legally sufficient to establish the offense charged . . . or any lesser included offense." Utah R. Crim. P. 17(o). When reviewing such a motion, the district court "is not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts." *Torres*, 2018 UT App 113, ¶ 17 (quotation simplified). Instead, "viewing the evidence in the light most favorable to the State, the court must determine whether the State has produced believable evidence on each element of the crime from which a jury, acting reasonably, could convict the defendant." *Id.* (quotation simplified). Thus, if "there is any evidence, however slight or circumstantial, which tends to show guilt of the crime charged, the court must submit the case to the jury." *Id.* (quotation simplified).

¶78   Here, Camara argues that Counsel should have filed a motion for a directed verdict on Counts 5, 9, and 10 based on the State's alleged failure to prove Bree's age for these counts, as well as on Counts 9 and 10 because the State allegedly failed to prove that he committed multiple acts. We disagree on all fronts.

A.   Our Decision to Review this Issue

¶79   Before addressing the merits of Camara's arguments, we think it appropriate to first address why we are doing so. As discussed more fully below in Part IV, we believe that our resolution of the mistrial issue makes it unnecessary for us to address several other issues raised by Camara on appeal. For the same reasons, in our initial opinion, we also declined to address this issue.

¶80   After we issued our initial opinion, however, Camara filed a petition for rehearing. He pointed out that if an appellate court reverses for insufficiency of the evidence—at least where the issue is preserved—the Double Jeopardy Clause of the United States Constitution prohibits the State from retrying the defendant on the affected counts in a retrial. *See, e.g.*, *Burks v. United States*, 437

U.S. 1, 11 (1978). Camara then asserted that because this ineffective assistance issue is based on an alleged insufficiency of the evidence, the Double Jeopardy Clause would likewise bar retrial if he prevails on it. He accordingly asked us to decide this issue now.

¶81    Reviewing our caselaw, however, it's unclear to us if Camara's procedural assertion is correct—at least on the state of the current law. In *State v. Smith*, we concluded that the defendant had received ineffective assistance because his attorney failed to ask for a directed verdict after the State failed to put on proof of something that we regarded as a necessary element of the charged offense. 2003 UT App 52, ¶¶ 31–35, 65 P.3d 648, *aff'd in part, rev'd in part*, 2005 UT 57, 122 P.3d 615. We then ordered a retrial on that count, concluding that because this was raised as an ineffective assistance claim, as opposed to a preserved insufficiency claim, retrial was the appropriate remedy and double jeopardy did not bar it. *Id.* ¶ 35 n.8. We observed that the "conclusion that [the defendant's] trial counsel was ineffective speaks to an error in the trial process and not an error in judgment concerning the quantum of evidence needed to convict and sentence," and we thus further observed that "the error giving rise to the reversal in this case [was] trial error and remanding for a new trial [did] not violate double jeopardy." *Id.* (quotation simplified). On certiorari, however, our supreme court concluded that the defendant was not entitled to a directed verdict because, in its view, the missing proof did not go to a required element. *See State v. Smith*, 2005 UT 57, ¶¶ 16–21, 122 P.3d 615. Because of this, the supreme court reversed our conclusion that the defendant had received ineffective assistance, and it therefore did not address our analysis of the potential double jeopardy implications of a contrary ruling. *See id.*

¶82    We're not aware of another controlling case that has definitively grappled with this question. But we do see Utah cases that have gone both ways on this, albeit without any detailed analysis. In some cases, we have reversed and ordered a retrial

after concluding that an attorney rendered ineffective assistance by failing to raise an insufficiency argument. *See, e.g.*, *Cedar City v. McCraw*, 2025 UT App 123, ¶ 14, 576 P.3d 1155, *petition for cert. filed*, Sep. 11, 2025 (No. 20251082); *State v. Nelson*, 2024 UT App 75, ¶ 21, 550 P.3d 495, 497, *cert. granted*, 561 P.3d 688 (Utah 2024). In other cases, however, we have remanded with instructions for the district court to vacate the convictions at issue. *See State v. Bell*, 2025 UT App 169, ¶ 25, -- P.3d --; *State v. Gonzales-Bejarano*, 2018 UT App 60, ¶¶ 45–47, 427 P.3d 251.

¶83 In response to Camara's petition for rehearing, the State filed a memorandum stating that it was not opposed to us reviewing the insufficiency-related ineffective assistance arguments in this appeal. In light of the State's non-opposition, we think it appropriate to do so. And for the reasons set forth below, we conclude that Camara did not receive ineffective assistance because he was not entitled to a directed verdict on any of the specified counts.

¶84 But in light of the authority just discussed, we regard it as an open question as to what the remedy should be in a case in which an appellate court concludes that the defendant received ineffective assistance because his or her trial counsel did not file what would have been a meritorious motion for a directed verdict based on insufficiency of the evidence. This is an important issue that could have significant implications in many cases. We accordingly encourage future litigants in affected cases to fully brief this issue so that it can be definitively resolved.

B. Proof of Age

¶85 In Count 5, the State charged Camara with rape of a child under Utah Code section 76-5-402.1. To convict Camara on this count, the State was required to prove that Camara had "sexual intercourse with a child who [was] under the age of 14." Utah

Code § 76-5-402.1(1) (2013).[20] In Counts 9 and 10, the State charged Camara with sodomy on a child under Utah Code section 76-5-403.1. To convict Camara on these counts, the State was required to prove that Camara "engage[d] in any sexual act upon or with a child who [was] under the age of 14, involving the genitals or anus of the actor or the child and the mouth or anus of either person." *Id.* § 76-5-403.1(1).[21]

1.      Counts 9 and 10 (Sodomy on a Child)

¶86    For contextual reasons that will become apparent shortly, we'll start with the sodomy on a child counts. In the elements instructions, the jury was told that the incidents supporting these counts were alleged to have occurred "on or between September 29, 2015[,] and July 10, 2016." In closing argument, the prosecutor told jurors that these counts were based on Camara "putting his mouth on [Bree's] vagina on two occasions during 8th grade."

¶87    On appeal, Camara claims that "the State did not produce evidence that any mouth-to-vagina touching occurred when [Bree] was 13 years old." In the briefs, both parties point to the following exchange from Bree's direct examination as being the foundational hook for these counts:

> Q. Now during the time—so we've talked about—
> you talked a little bit about sexual intercourse.

---

20. We've cited the version of the statute that was in effect at the time of the alleged conduct. The current version of this offense contains a functionally similar element that requires proof that the victim was "younger than 14 years old." Utah Code § 76-5-402.1(1)(a)(i).

21. As with rape of a child, the current version of this offense requires proof that the victim was "younger than 14 years old." Utah Code § 76-5-403.1(2)(a)(ii).

A. Yeah.

Q. Was there any other sexual contact between you and [Camara] *during this time*?

A. Yeah. He would put his penis in my mouth, he would put my vagina in his mouth, and he also inserted his penis into my anal cavity. I don't know what to call that.

(Emphasis added.)

¶88   The question thus turns on whether the first emphasized phrase—"during this time"—could reasonably be interpreted as referring to a "time" in which Bree was 13 years old. Contrary to Camara's assertions, we believe there was sufficient evidence from which the jury could think that it did.

¶89   First, on its face, the reference to "this time" was clearly linked to the prior question, wherein the prosecutor had referred to prior testimony from Bree about "the time" in which she and Camara had "sexual intercourse." At this point in the trial, the only sexual intercourse that Bree had testified about was the sexual intercourse that had allegedly occurred on September 29, 2015, on the Alpine Loop and then at Camara's house. Because Bree's birthday was in July 2002, these incidents would have occurred when she was 13 years old. For this reason alone, the question at issue ("Was there any other sexual contact between you and [Camara] during this time?") and Bree's affirmative answer to it could reasonably be interpreted as referring to an incident that occurred in the same period—and, thus, while Bree was 13 years old.

¶90   Second, this interpretation is also consistent with how the broader questioning at trial had proceeded. As the State points out, the prosecutor at trial generally asked Bree questions in a "chronological[]" manner. Indeed, the prosecutor "used a large calendar as a demonstrative exhibit and marked it with important

dates as [Bree] testified." Of note, at the time of the exchange we just quoted (wherein Bree testified about the mouth-to-vagina contact), the prosecutor had been asking Bree questions about things that happened during the school year in which she was in eighth grade and 13 years old, not the school year in which she was in ninth grade and 14 years old.[22] For example, in exchanges that occurred before this one, Bree was asked about the incidents that allegedly occurred at Kyhv Peak on September 22, 2015, and on the Alpine Loop and at Camara's house on September 29, 2015. Then, in exchanges that occurred after this one, Bree was asked about an incident in which Camara allegedly had anal sex with Bree. As part of her testimony about that incident, Bree said that after the anal sex happened, she sat in her United States history class wondering if "anyone else [was] . . . going through this" "*at 13*" years old. (Emphasis added.)

¶91     By contrast, Bree was not asked about incidents that occurred in her ninth-grade year until later. And when the prosecutor shifted to that time period, she began by asking Bree where she went to school for ninth grade, and the prosecutor then marked the calendar exhibit for "the fall of 2016" accordingly. This occurred over ten pages of transcript after the exchange in which Bree talked about the mouth-to-vagina contact. In light of this, it seems that when Bree testified about the mouth-to-vagina contact, she did so in the context of questioning that was anchored to her eighth-grade year—and, thus, while she was 13 years old.

¶92     Pushing back, Camara points out that in between Bree's prior testimony about the Alpine Loop encounter and the question about "any other sexual contact" that occurred "during this time," there was an intervening discussion about the layout of the Camara house that spanned several pages of text. In light of this digression, Camara argues that the discussion about the

---

22. Because Bree had a summer birthday, it was unquestioned that she was 13 years old during the entirety of her eighth-grade year and 14 years old during the entirety of her ninth-grade year.

house essentially broke the chronological sequencing, such that the jury would have no basis to reasonably infer that the prosecutor was asking about the same time period.

¶93    But this is at odds with the question itself. As just discussed, the question at issue expressly referenced Bree's testimony about prior sexual intercourse—and at this point in the trial, this could only have been about the alleged September 29, 2015 sexual intercourse. So, even with the intervening discussion about the house, this question was linked to that same period.

¶94    Moreover, even on its own terms, the intervening discussion about the layout of the house was grounded in the same general period of time. After Bree testified about the events that allegedly occurred on the Alpine Loop and at Camara's house on September 29, 2015, the prosecutor asked her if, at the time of that encounter, she had her "own bedroom" at Camara's house. Bree responded that she did not. The prosecutor then asked whether Bree got her "own bedroom" "[a]t some point." Bree responded that "for Christmas," Camara cleared out a storage room and created a separate room for her. On appeal, Camara agrees that this referred to something that occurred "in December 2015," which was when Bree was 13 years old. At that point, the prosecutor and Bree then spent several pages of transcript discussing the layout of the Camara house and how that bedroom fit into the floor plan. When that discussion concluded, the prosecutor shifted back to a discussion of the sexual encounters described above.

¶95    Thus, contrary to Camara's contention on appeal, the discussion about the house didn't shift the chronology to some other year. At most, it arguably shifted the discussion to the winter of 2015, as opposed to the fall of 2015. But in both the fall and winter of that year, Bree was still 13 years old. And regardless, when the prosecutor returned to the subject of sexual conduct, the prosecutor expressly re-anchored the discussion to Bree's earlier testimony about sexual intercourse—which, again,

could only have referred at that point to testimony about encounters that occurred in the fall of 2015.

¶96 Thus, viewing the evidence in the light most favorable to the State's case, we agree that there was at least some "evidence, however slight or circumstantial, which tend[ed] to show guilt of the crime charged." *Torres*, 2018 UT App 113, ¶ 17 (quotation simplified). As a result, a motion for a directed verdict on these counts would have been futile, and Camara therefore did not receive ineffective assistance when Counsel did not file such a motion.

2.     Count 5 (Rape of a Child)

¶97 Camara next claims that Counsel provided ineffective assistance by failing to move for a directed verdict on Count 5, again claiming that the "State put on no evidence of [Bree's] age" relating to that count. We disagree.

¶98 The elements instruction for Count 5 informed jurors that Camara was alleged to have committed rape of a child "on or between September 29, 2015, and July 10, 2016." In closing argument, the prosecutor told jurors that Count 5 was based on the encounter in which Camara "insert[ed] his penis into [Bree's] vagina during the night in 8th grade at Centennial Junior High when [Bree] came out of her room to get water" and Camara then "took her back into her bedroom and raped her." On appeal, Camara alleges that there was no evidence of Bree's age because, in the relevant portion of her testimony, Bree "did not say how old she was or when this incident occurred."

¶99 The key exchange from Bree's direct examination was as follows:

> Q. Okay. So how many times while you're going to Centennial Middle School in 9th grade, how many times do you think he had sexual intercourse with you?

A. Probably a hundred or more times.

Q. Most of those times he would pull out and then finish in your mouth?

A. Yeah.

Q. The—I want you to think about the time where—other than the time we've talked about up the canyon on September 29th of 2015 and then back at the house, I want you to tell us about another time that you remember the most where he was having sexual intercourse with you.

A. I remember there was one time I had woken up in the middle of the night, and I had come out to the living room so I could grab water, and I came out to the living room to ask if it was like okay if I got water, and when I walked out, he was touching his penis—or I think that he was. I think I caught him touching his penis, and when he saw that I was awake, he took me back into my room and—this is when—the back room, when I had had one—and he had inserted his penis into my vagina and like had sex with me.

¶100 Viewing the record as a whole, we think there are two reasons why the jury could conclude that the incident Bree described from the middle of the night occurred when she was 13 years old.

¶101 The first is the same pattern of questioning that we just discussed. This exchange happened shortly after the exchange that supported the sodomy on a child counts (Counts 9 and 10). As noted, the prosecutor at that point was asking questions about things that happened in Bree's eighth grade year, which was when she was 13 years old. Bree discussed the anal sex incident we described above (the one in which, after it occurred, she sat in

class and wondered if "anyone else [was] . . . going through this" "at 13" years old) *after* she described the middle-of-the-night encounter at issue in Count 5. And when the prosecutor shifted to ninth grade and marked the calendar accordingly, that moment occurred ten transcript pages after the exchange about the sexual intercourse that occurred in the middle of the night.

¶102   When evaluating the sufficiency of the evidence, context matters. *See State v. Gardner*, 2007 UT 70, ¶ 24, 167 P.3d 1074. And we allow and even instruct jurors to use some measure of common sense when evaluating testimony. *See State v. Ashcraft*, 2015 UT 5, ¶ 37, 349 P.3d 664; *Herzog v. Vail Resorts, Inc.*, 2025 UT App 69, ¶ 55, 572 P.3d 402. When viewed in context, the jury could have reasonably understood that this testimony was about events that occurred in Bree's eighth-grade year and, thus, when she was 13.

¶103 Second, the language of this exchange supports this conclusion as well. As an initial matter, we note that the first question in this exchange contained an internal inaccuracy. The prosecutor asked Bree "how many times" she "had sexual intercourse" with Camara while she was "going to Centennial Middle School in 9th grade." But as noted, Bree went to Centennial Middle School for the eighth grade and Timpview High School for ninth grade. Bree didn't pick up on the discrepancy from the stand, instead affirmatively responding that she had sexual intercourse with Camara "a hundred or more times" that year.

¶104   Again, Camara now argues that Counsel should have filed a directed verdict motion on the basis of a lack of evidence about Bree's age. If Counsel had filed such a motion, however, the district court would have been required to view the evidence "in the light most favorable to the State," *Torres*, 2018 UT App 113, ¶ 17, and "the existence of contradictory evidence or of conflicting inferences" would not warrant deciding the question in the defense's favor, *State v. Hosman*, 2021 UT App 103, ¶ 31, 496 P.3d

1162 (quotation simplified). Thus, to the extent that this question-and-answer contained an internal conflict that could cut either way in terms of Bree's age, that conflict would go the State's way, not Camara's way, because the jury could have chosen to resolve that conflict in the State's direction. And such a conclusion would have been reasonable given that the questioning at that point had been about things that happened during Bree's eighth-grade year and that the prosecutor had not yet asked questions about things that happened in ninth grade or marked the calendar accordingly.

¶105   This leads to the latter part of the exchange that we've just quoted, which is where Bree described the incident that occurred in the middle of the night. On appeal, Camara suggests that this answer was not linked to the earlier question about events that occurred while Bree was "going to Centennial Middle School in 9th grade" or, of note, its time period. In Camara's view, the intervening question essentially broke the sequence, as did the prosecutor's request for Bree to "tell us about another time" when the two had sexual intercourse.

¶106   But again, if this had been presented in a directed verdict motion, the court would have had to view the testimony in the light most favorable to the State. So viewed, we agree with the State that these questions were at least plausibly linked together in something of a sequence. After the prosecutor initially asked Bree "how many times" she had sexual intercourse with Camara that year, the prosecutor's next question asked for more specific information about "*those* times." (Emphasis added.) Then, in the next question, the prosecutor asked Bree to "tell us about *another* time" that she "remember[ed] the most." (Emphasis added.) In context, the words "those times" and "another time" seemed to link these three questions together in something of a sequence, with the questions progressing from general to specific. It was Bree's answer to the final question in this sequence that described the incident that occurred in the middle of the night. We see no clear indication that, somewhere in this sequence, either the prosecutor or Bree shifted to a different time period. And again,

this conclusion is reinforced by the fact that the prosecutor was at that point asking questions about things that happened in eighth grade.

¶107 In short, and with respect to both of Camara's age-related claims, given the manner in which the evidence had been chronologically presented, the fact that Bree's testimony had been anchored to a time period in which Bree was 13 years old, and the fact that the exchanges in question contained certain contextual cues that also grounded these answers to that same period, we believe that there was at least some evidence from which jurors could conclude that Bree was testifying about things that happened when she was 13 years old. We accordingly conclude that a motion for a directed verdict on these bases would have failed, and Counsel therefore did not perform deficiently by not making it.[23]

C.    Multiple Acts on Counts 9 and 10 (Sodomy on a Child)

¶108 Camara next argues that Counsel should have moved for a directed verdict on Counts 9 and 10 based on a lack of proof that there were "multiple acts" as needed "to sustain a conviction on two charges." We disagree.

¶109 As noted, Bree testified that Camara "*would* put [her] vagina in his mouth" during this period. (Emphasis added.) In this sense, the word "would" is often used to "express custom or habitual action," and the Merriam-Webster Dictionary uses as an illustrative example the phrase "we *would* meet often for lunch,"

---

23. Camara also claims that Counsel was ineffective for failing to object to certain statements the prosecutor made in closing argument that suggested there was evidence presented of Bree's age relating to Counts 5, 9, and 10. Because we conclude that there was sufficient evidence to show Bree's age relating to these counts, we reject this argument.

which plainly connotes multiple events.[24] Other sources agree. Strunk and White, for example, state that the word "would" is "[c]ommonly used to express habitual or repeated action." William Strunk, Jr. & E.B. White, *The Elements of Style* 64 (4th ed. 2000). And another dictionary explains that "would" can be "used to suggest that in the past something happened often or always."[25]

¶110   Indeed, Bree used the habitual "would" in other places in her testimony. Within this same answer, for example, Bree said that Camara "would put his penis in [her] mouth." When she was asked a few moments later to clarify how many times that occurred, she said it was "more than . . . 15, but probably less than . . . 50." Counsel also used the habitual "would" when questioning Bree to express something that had happened more than once. At one point, for example, Counsel asked, "So most of the time you guys got along, but there were occasions where you guys would have little arguments like that?"

¶111   Again, Camara has raised this claim through the prism of the ineffective assistance of counsel doctrine, which poses a hurdle for his claim, and Camara faults Counsel for not moving for a directed verdict, which poses another hurdle of its own. Given Bree's statement that Camara "would" put his mouth on her vagina, we think that Counsel could have reasonably concluded that a motion on this basis would have failed. We therefore reject this claim for lack of deficient performance.

### IV. Remaining Issues and Proceedings on Remand

¶112   In addition to the above issues, Camara has argued that he received ineffective assistance because Counsel did not request a

---

24. *Would*, Merriam-Webster, https://www.merriam-webster.com /dictionary/would [https://perma.cc/7EXN-XHC6] (emphasis in original).

25. *Would*, Cambridge Dictionary, https://dictionary.cambridge.org /us/dictionary/english/would [https://perma.cc/NKS9-6CRC].

unanimity instruction on two of the counts relating to sodomy on a child. In the rule 23B motion that Camara filed contemporaneously with his brief, Camara also asked for a remand on whether Counsel provided ineffective assistance by not introducing several additional types of evidence. Because a majority of this court has reversed the denial of the motion for a mistrial and has remanded for further proceedings on that issue, a decision from this court on these issues may prove unnecessary. This is so because, if the court ultimately declares a mistrial, Camara would be entitled to a new trial. Given this dynamic, we exercise our discretion to not address these additional issues further.

¶113   In doing so, we acknowledge that, after oral argument and while our deliberations on the above issues were ongoing, we concluded that Camara had met his burden of showing that he was entitled to a remand to create a record on some of the ineffective assistance claims. We acknowledge the work done by the parties and the court in the remand, but we decline to rule on those issues unless warranted by future developments in the case.

¶114   In terms of the remand that we are now ordering relating to the mistrial issue, the district court should follow the directives set forth more fully in the separate opinion, which, again, is the controlling opinion as to that issue. As explained more fully there, the district court on remand should (1) apply *Soto* and (2) determine whether the presumption of prejudice has been rebutted. If the court concludes that the State has rebutted the presumption, the case should be returned to this court for further proceedings on the remaining issues.

CONCLUSION

¶115   We first conclude that the district court did not abuse its discretion when it sanctioned the State for improperly obtaining files from Expert's hard drive, rather than dismissing the case entirely. We next conclude that Camara was entitled to a

rebuttable presumption of prejudice relating to outside contact with Juror 7, and we remand this case to the district court to decide whether that presumption has been rebutted. Finally, we conclude that Camara did not receive ineffective assistance when his trial counsel did not file a motion for a directed verdict on several of the counts.

———————

HARRIS, Judge (concurring in part and authoring the Opinion of the Court as to Part II, in which Luthy, J., joined):

¶116  Along with Judge Luthy, I join in paragraphs 1–43 of the lead opinion, including its entire factual recitation and Part I of its legal analysis. We also join in Part III of its legal analysis and Part IV, which contains some of the court's instructions on remand. We part ways with the lead opinion, however, with regard to Part II of its legal analysis. Unlike the lead opinion, we are persuaded that the presumption of prejudice discussed in *State v. Soto*, 2022 UT 26, 513 P.3d 684, applies to the mistrial motion Camara filed after learning that three jurors had overheard comments from the gallery.[26] And because the district court did not have an

---

26. We note that *State v. Soto*, 2022 UT 26, 513 P.3d 684, was issued after Camara's trial. We also note, however, that *Soto* explained that it was not establishing a new rule but was instead merely synthesizing principles set forth in previous cases. *See id.* ¶ 15 ("A long line of Utah cases dating back to statehood recognizes that improper contacts between juries and third parties may trigger a rebuttable presumption of prejudice, depending on *who* made the improper contact, *what* was said, and the *circumstances* of the contact."); *see also id.* ¶ 39 n.9 ("[T]he balancing test comes not from our imagination, but from our case law."). In his opening brief, Camara invoked *Soto*, asserted that it was controlling, and argued that he was entitled to reversal under it. In its responsive brief, the State did not argue that *Soto* was inapplicable because it was issued after Camara's trial; rather, accepting *Soto* as

(continued…)

opportunity to assess whether this presumption had been overcome, we vacate the order denying the motion for mistrial and remand the case to the district court to make that determination in the first instance.

### I. Under *Soto,* What Happened Here Constitutes Unauthorized Communication Likely to Influence the Jury's Judgment

¶117   The main point of disagreement between this opinion and the lead opinion concerns whether the comments made by Bree or her attorney in the gallery during trial—and overheard by one non-alternate juror[27]—constitute the sort of "unauthorized

---

controlling authority for purposes of this appeal, the State simply argued that Camara was not entitled to reversal under the test set forth therein. We follow the parties' lead in assuming that *Soto* applies here and thus analyze the parties' arguments under its principles. We acknowledge, like Judge Tenney, *see supra* ¶ 45 n.12, that in doing so, our interpretation of *Soto* is not exactly that advanced by either of the parties, but we echo the principle that it is our obligation "to get the law right" as we see it, *In re B.T.B.,* 2020 UT 60, ¶ 40, 472 P.3d 827.

27. The comments were apparently at least partially overheard by Jurors 7, 9, and 10. But Jurors 9 and 10 were alternates and were each excused before deliberations began. And at the beginning of the trial, the court instructed jurors to not discuss the case until they had "received all the evidence and all the instructions of law that [would] pertain to [their] deliberations." Camara has not argued that there is any reason to think that the jurors did not comply with that instruction. While the comments heard by Jurors 9 and 10 would likely qualify as "improper contacts" for purposes of the *Soto* analysis, we agree with the State that, on the basis of this record and the arguments presented to us, there's no basis for concluding that, even with the presumption of prejudice, Camara was prejudiced in any way through the statements

(continued…)

communications likely to influence the jury's judgment" that trigger the presumption of prejudice discussed in *Soto*. *Id.* ¶ 18. We think they did because—while the comments were made inside the courtroom—they were made by a person who was, at the time, a third party to the constitutionally protected jury process and they were not observed by the district court.

¶118 As noted in the lead opinion's factual recitation, *supra* ¶¶ 24, 26, Wife testified on Camara's behalf and, among other things, she offered testimony that directly supported Camara's alibi defense for one of the charges. At some point during Wife's testimony, Juror 7 overheard either Bree or the woman sitting next to her say, "[S]he's lying." Because Bree had already testified, Juror 7 of course knew who Bree was, and given the setting and context, Juror 7 would have had reason to assume that the woman sitting next to Bree was connected to Bree in some meaningful way.[28] Thus, the situation presented to us is that, during the trial, one of the jurors overheard either the alleged victim or someone associated with her make what was essentially an unsworn factual refutation of testimony being offered from a defense witness. In our view, this must qualify as an "outside influence" or "unauthorized contact" for purposes of *Soto*, because this would have exposed Juror 7 to evidentiary "influences other than that which are produced by the legal evidence and the law governing the case." *Id.* ¶¶ 18, 30, 40 (quotation simplified).

¶119 Pushing back, the State points out that in past Utah decisions, the presumption of prejudice has been applied only to

---

overheard by these jurors. *See, e.g.*, *State v. Miller*, 674 P.2d 130, 131 (Utah 1983) (explaining that since "the alternate juror never even entered jury deliberations," that juror "had no bearing on the jury's verdict"). We therefore limit our discussion and analysis to the things that Juror 7 overheard.

28. Although Juror 7 didn't know this at the time, the woman in question was Bree's attorney.

"cases involving direct extra-judicial communication between jurors and witnesses." The State then asserts that what occurred here was not a *direct* contact between an outsider and a juror; instead, it characterizes this event as merely an overheard remark that was not intended to reach any juror's ears. It is certainly true that the comments here were not directed at jurors and were likely not intended to be heard by them, but contact with jurors does not have to be intentional to be unauthorized; even overheard conversations can constitute unauthorized juror contact.

¶120   Indeed, we suspect that the primary reason that *Soto* only discussed cases involving direct or intentional contact with jurors is that this is what happened in *Soto* itself. There, "a uniformed highway patrolman" and "a court IT technician" had made comments directly to jurors in "a nonpublic, court-employee elevator." *Id.* ¶ 6. Since this was the scenario at issue, it makes sense that the court's legal analysis would focus in on language from past cases that had also involved direct "contacts" and "communications" between outsiders and jurors. *Id.* ¶¶ 20, 25.

¶121   But *Soto* never said that the presumption of prejudice applies *only* to intentional or targeted communications between outsiders and jurors (as opposed to unintentional or non-targeted communications). To the contrary, in one key passage, *Soto* indicated that the opposite is true. While discussing the kinds of circumstances that constitute prohibited "jury 'conduct'" that could support a presumption of prejudice, the court stated that such conduct "is not limited to affirmative and intentional actions taken by a juror" but "also includes inadvertent conduct and communications directed at a juror."[29] *Id.* ¶ 33 n.7. By referencing

---

29. The lead opinion attempts to dismiss this language from *Soto* by reading it to require that the conduct be "both 'inadvertent' *and* 'directed at a juror.'" *See supra* ¶ 53 n.16. But this misreads *Soto*'s footnote, which simply said that improper jury conduct "*includes*" both "inadvertent conduct and communications directed at a

(continued…)

"inadvertent conduct," *Soto* contemplated that the presumption of prejudice can be triggered even where the speaker did not intend to make contact with a juror. *Id.* And the clearest way that an outsider could unintentionally communicate with a juror would be by having a conversation in close proximity to the juror, thereby allowing the juror to overhear it.

¶122   Even beyond this guidance from *Soto*, two other concepts persuade us that the better reading of *Soto* is that unintentional communications can trigger the presumption of prejudice.

¶123   First, *Soto* stated that courts should not "obsess[] over the *form* of the intrusion" and instead directed courts to focus "on the *principle* guarding against it—safeguarding in every possible way the purity of the stream of justice; to prevent it from in any manner being polluted by influences other than that which are produced by the legal evidence and the law governing the case." *Id.* ¶ 30 (emphasis added) (quotation simplified). In *Soto*'s view, the "consistent thread that connects" the past decisions in this area is "the concern for jury purity, alongside the threat to that purity caused when an outsider invades the jury's privacy." *Id.* Whether intentional or not, what happened here was that an outsider provided unauthorized factual information (i.e., "she's lying") to a juror during the trial. This violates the "jury purity" principle that, in *Soto*'s view, underlies court decisions in this area.

¶124 Second, while *Soto* relied on a number of past Utah decisions, it also drew from cases from other jurisdictions. *See id.* ¶¶ 28–30. And we note that both the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit have held that a presumption of prejudice can be triggered by *indirect* non-innocuous contacts and communications with jurors. *See, e.g.,*

---

juror," not that it *requires* both "inadvertent conduct and communications directed at a juror." 2022 UT 26, ¶ 33 n.7 (emphasis added). Inadvertent conduct can qualify, and so can direct communications.

*Remmer v. United States*, 347 U.S. 227, 229 (1954) ("In a criminal case, any private communication, contact, or tampering directly *or indirectly*, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." (emphasis added)); *accord Stouffer v. Duckworth*, 825 F.3d 1167, 1178 (10th Cir. 2016); *Stouffer v. Trammell*, 738 F.3d 1205, 1214 n.5 (10th Cir. 2013). And courts following these principles have held that a presumption of prejudice can arise when jurors overhear comments, even if the comments weren't aimed at them. *See, e.g.*, *Neal v. John*, 110 F.R.D. 187, 188–89 (D.V.I. 1986) (holding that "the presumption of prejudice must arise" where a juror "overheard a conversation in which a defense witness stated that he had been paid for his testimony," as well as another comment that "a defense witness had perjured herself").

¶125 For these reasons, we are unpersuaded by the State's attempt to distinguish *Soto* on the basis that the conversation was indirect and not directly intended for jurors' ears.

¶126 Aside from the State's assertions, the lead opinion contends that *Soto*'s presumption of prejudice cannot apply here, as a threshold matter, because the comments made occurred inside the courtroom while the trial was going on. We read *Soto* differently. To the extent that *Soto* has a threshold requirement, the question raised by that requirement is not whether the contact occurred physically inside or outside of the courtroom but, instead, whether the contact was *unauthorized*. *See* 2022 UT 26, ¶ 18 (outlining the presumption of prejudice test as the "remedy for *unauthorized* communications likely to influence the jury's judgment" (emphasis added)); *id.* ¶ 40 (explaining that "any *unauthorized* contact during a trial between witnesses, attorneys or court personnel and jurors that goes beyond a mere incidental, unintended, and brief contact will trigger the presumption of prejudice" (emphasis added) (quotation simplified)). And in our view, what differentiates authorized contact from unauthorized contact is that authorized contact occurs on the record in the run

of trial.[30] Unauthorized contact, by contrast, occurs off the record. Drawing this "threshold" line here—at off-the-record versus on-the-record contact, instead of at inside versus outside the courtroom—makes a lot more sense, for two reasons.

¶127 First, this is where our rules of civil procedure have chosen to draw the line: "There shall be no *off-the-record* communication between jurors and lawyers, parties, witnesses or persons acting on their behalf." Utah R. Civ. P. 47(*l*) (emphasis added). We consider it notable that rule 47(*l*) was discussed by the majority and dissenting opinions in *Soto,* and all five justices agreed that off-the-record contact with jurors that goes beyond mere incidental communications poses a threat to juror impartiality and implicates the presumption of prejudice. *Compare Soto*, 2022 UT 26, ¶¶ 58–60, *with id.* ¶¶ 113–25 (Petersen, J., dissenting).

¶128 The dissenting opinion in *Soto* stated that it would not have "adopt[ed] the 'balancing test' established by the majority" for determining when the presumption of prejudice should attach, in part because the dissent believed that Utah's "precedent and procedural rules have already established principles for identifying impermissible off-the-record communication with

---

30. In this context, by "on the record" contact we mean communications by the attorneys, sworn witnesses on the stand, the court, and court personnel during the official "jury process," *see Soto*, 2022 UT 26, ¶¶ 18, 27, which is usually designated by the court announcing that the proceedings are on the record. Under this definition, a communication made during the official jury process is nonetheless "off the record," for present purposes, if it is made by someone other than the court, court personnel, the attorneys, or a sworn witness on the stand. Additionally, whether a jury contact is "on the record" does not turn on whether it is sufficiently discernable for a court reporter to later include it in a transcript of the proceedings. It turns on whether the contact was made during the official jury process by one who is permitted to communicate with the jury during that process.

jurors." *Id.* ¶ 109 (Petersen, J., dissenting). But even the dissent seemed to accept the principle that the type of communications that might trigger the presumption were *off-the-record* communications. Indeed, the dissent stated as follows: "A brief and incidental 'excuse me' in the hallway, or a 'gesundheit' after a sneeze, would not offend this rule. But we do not want jurors and witnesses, the parties, or their lawyers to say much more than that to one another *off the record*." *Id.* ¶ 113 (emphasis added).

¶129   In response, the majority in *Soto* agreed that our procedural rules provide "useful guidelines for juror behavior," but it concluded that those rules do not "prescribe the remedy for their violation." *Id.* ¶ 58 (majority opinion). Specifically, the majority explained that "rule 47(*l*)'s prohibition on all 'off-the-record communication between jurors and lawyers, parties, witnesses or persons acting on their behalf' does not tell us when we should presume prejudice for its violation." *Id.* ¶ 60. To answer that question, the court stated that prejudice will be presumed "when *such a communication* goes beyond a mere incidental, unintended, and brief contact." *Id.* (emphasis added) (quotation simplified). Thus, while the majority did not apply rule 47(*l*) in formulating its three-part test regarding "when a court must presume prejudice," *id.* ¶ 59, the majority did appear to acknowledge the underlying principle that the communications to which its newly articulated balancing test would apply would be off-the-record communications between jurors and others.

¶130   To be sure, the specific "threshold" issue identified by the lead opinion was not explicitly articulated or discussed in *Soto*, and the *Soto* opinions address rule 47(*l*) only in an effort to establish the sufficiency of their respective analytical frameworks. But both opinions in *Soto* seem unified in acknowledging the relevance of rule 47(*l*)'s prohibition of *off-the-record* communications between jurors and trial participants, and both agree that juror impartiality is drawn into question when jurors are exposed to such off-the-record communications. *See id.* ¶ 60; *id.* ¶ 113 (Petersen, J., dissenting).

¶131 Second, statements made on the record are subject to a litany of procedural safeguards that are not applicable to statements made off the record. Before a witness can offer testimony to the jury, the proponent party must first disclose the witness to the other side. *See* Utah R. Crim. P. 16(a)(5)(A); Utah R. Civ. P. 26(a)(1)(A). At trial, when a witness takes the stand and communicates with the jury on the record, that testimony must be under oath, Utah R. Evid. 603, is subject to cross-examination, and is subject to our evidentiary rules, such as rule 403's prohibition on unduly prejudicial evidence, *id.* R. 403, and rule 802's bar against hearsay statements, *id.* R. 802. When a witness provides improper testimony, opposing counsel may object and develop the basis for the objection on the record, *id.* R. 103, and the court may choose to remedy the error by striking the testimony and providing a curative instruction to the jury, *id.* R. 103, 105.[31]

¶132 These safeguards are meant to control the stream of evidence the jury receives and to provide real-time recourse to the party adversely affected by the introduction of inadmissible evidence. *See, e.g.*, *Soto*, 2022 UT 26, ¶ 27 (explaining that the right to an impartial jury under the Sixth Amendment requires that the "evidence developed against a defendant *shall come from the witness stand* in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (emphasis added) (quotation simplified)); *id.* ¶ 30 (explaining that a key principle underlying other jurisdictions' approaches to improper jury contacts is the need to safeguard the jury from "being polluted by influences other than th[ose] which are produced by the legal evidence and the law governing the case" (quotation simplified)). By contrast,

---

31. At one point in its analysis, the lead opinion makes it sound as though procedural safeguards would also apply to statements that occur inside the courtroom but off the record. *See supra* ¶ 50. That's just simply not the case—statements from the gallery are not subject to disclosure rules, evidentiary rules, or cross-examination, among other things.

statements made off the record are not subject to any of these specific safeguards.

¶133   The lead opinion questions why this distinction matters and, specifically, why a presumption of prejudice should be applied to an errant comment from the gallery when witnesses often provide improper or inadmissible testimony from the stand. *See supra* ¶¶ 64–66. The lead opinion points out that if a witness offers improper testimony that "was bad enough," the "adversely affected party can move for a mistrial," where the ordinary standard for a mistrial applies, not the three-part test set forth in *Soto. Supra* ¶ 65. Given this reality, the lead opinion posits that "[i]f the ordinary mistrial standard is sufficient to protect a defendant's right to a fair trial when something improper is said on the stand," the same standard should be adequate "to protect that same right if something improper is said from the gallery." *Supra* ¶ 66.

¶134   But this logic would erase *Soto*—and all presumption of prejudice cases—from the books. If the ordinary mistrial standard is sufficient to protect a defendant's right to a fair trial when something improper is said off the record but in the courtroom— say, in the gallery—why wouldn't it also be adequate to protect that same right when something improper is said just outside the courtroom in the hallway? Or across the street at a restaurant? Or at the accident site or scene of the crime? The lead opinion's argument here, taken to its logical conclusion, thus appears to take issue with the notion that we should *ever* apply a presumption of prejudice in jury-contact cases. And that argument, by definition, proves too much, because we are bound to follow *Soto* and its acceptance of the idea that "unauthorized contact during a trial between witnesses, attorneys or court personnel and jurors that goes beyond a mere incidental, unintended, and brief contact will trigger the presumption of prejudice." *See* 2022 UT 26, ¶ 40 (quotation simplified).

¶135   Indeed, in our view, the facts of this case highlight exactly why the *Soto* test should be applied to jury contact that occurs in the courtroom but off the record. After all, the fact that the unauthorized statement was made in the courtroom during a key witness's testimony on a critical part of Camara's alibi makes the potential for prejudicial influence *worse* than if the same statement had been made, say, in the hallway during a recess or in the walk-up lunch restaurant line across the street. Thus, not only does the line drawn by the lead opinion—inside the courtroom versus outside the courtroom—strike us as somewhat arbitrary, but we also think it is clearly at odds with both the text of rule 47(*l*) and the purpose of the *Soto* test: to allow a district court to weigh the prejudicial effect of an unauthorized jury contact based on the "who," the "what," and the "circumstances" of the contact, without considering the place of the contact as a categorical threshold limitation.

¶136   On this point, the lead opinion appears to conflate two distinct questions: whether a statement is admissible as evidence and whether the speaker is authorized to communicate with the jury. Even when testimony is *in*admissible, the attorney for the adversely affected party may nevertheless opt not to object to its admission if there are strategic reasons for doing so. In other words, there are instances where evidence that is technically inadmissible can be properly considered by the jury. However, wholly unauthorized statements—namely, those made off the record—are not subject to this sort of attorney calculus. Again, statements made off the record bypass our procedural, evidentiary, and constitutional safeguards.

¶137   Finally, we disagree with the lead opinion that *State v. Cardall* cautions away from applying the *Soto* test for in-court occurrences. *See* 1999 UT 51, 982 P.2d 79. In *Cardall*, the jury observed an interaction between the victim-witness and the witness's mother during a recess and after the trial judge had retired to chambers. *Id.* ¶ 12. This interaction took place inside the courtroom, but it occurred off the record during a break in the

proceedings. *Id.* Yet our supreme court did not apply the presumption of prejudice because there had been "no conversation between witnesses and jurors, just a quiet exchange between [the victim] and her mother." *Id.* ¶ 21. According to the lead opinion, this suggests that off-the-record communications in the courtroom do not implicate the presumption of prejudice test.

¶138 We read *Cardall* differently. In that case, the court assessed whether the interaction between the witness and her mother was an "impermissible jury contact," *id.*, and on this point it seems apparent that this innocuous interaction was not the kind of substantive jury contact that would satisfy the *Soto* test. Although the *Soto* test had not yet come into being, we suspect that had this contact been rinsed through that test—who said what to whom, and under what circumstances—the court would have concluded that this contact did not trigger a presumption of prejudice. Indeed, the court in *Cardall* provided sufficient reasons to reject the presumption of prejudice under *Soto*'s analytical framework. Specifically, the court in *Cardall* was unpersuaded that the interaction was problematic regarding juror bias—or the "what" under the *Soto* test. The court explained that "[t]he contact between [the witness] and her mother was a quiet exchange of affection, and there was no discussion regarding the substance of [her] testimony or the case against [the defendant]." *Id.* ¶ 12. And the court explained that "there was no conversation between witnesses and jurors." *Id.* ¶ 21. In other words, there were reasons for the *Cardall* court to reject the presumption of prejudice, even under the *Soto* test, that had nothing to do with whether the interaction occurred inside or outside the courtroom.

¶139 For all of these reasons, we conclude that the jury contact at issue here was the sort of contact that calls for application of the *Soto* balancing test (rather than the ordinary rules governing motions for mistrial). The contact in question occurred off the record, and it was therefore an "unauthorized communication[] likely to influence the jury's judgment." *See Soto*, 2022 UT 26, ¶ 18. We are unpersuaded by the State's argument that only direct and

intended contact with jurors should count, and we do not read *Soto*'s balancing test as being applicable only to jury contacts that occur outside the four walls of the courtroom. Our holding today is that, regardless of whether the jury contact occurred inside or outside the courtroom, if it occurred off the record and outside the observation of the trial judge, then it falls within the ambit of *Soto* and calls for application of that case's balancing test.[32]

## II. *Soto*'s Three-Part Test

¶140 We accordingly turn to the question of whether, under *Soto*'s balancing test, a presumption of prejudice applies in this case. As noted, *Soto* established a three-part "balancing test" under which courts "consider[] *who* said *what* and the *circumstances* surrounding the contact." *Id.* ¶ 39. *Soto* further held that there are no "categorical rule[s] as to what statements" made by what kind of outsider "necessarily trigger the presumption." *Id.* ¶ 40; *accord id.* ¶ 41; *see also id.* ¶ 50 n.10 (declining to adopt a "brightline rule" in this regard). Instead, *Soto* held that when conducting this balancing, courts should "look to the rationale" underlying these cases, which is that "unauthorized contact during a trial between witnesses, attorneys or court personnel and jurors that goes beyond a mere incidental, unintended, and brief contact will trigger the presumption of prejudice." *Id.* ¶ 40 (quotation simplified).

---

32. Although *Soto*'s logic may arguably require application of the *Soto* balancing test to off-the-record jury contact that occurs *within* the sensory observation of the judge, that is not the scenario presented here. We therefore need not (and do not) resolve the question of whether an off-the-record jury contact occurring within the sensory observation of everyone in the courtroom—that is, scenarios such as those from the cases listed in paragraph 67 of the lead opinion—would require application of the *Soto* balancing test.

¶141 **Who.** On the who prong, *Soto* held that the "more important the speaker in the proceedings, or the more authoritative the speaker within the criminal justice system, the more likely" it is that a court should "presume prejudice." *Id.* ¶ 41. *Soto* also held that a court should "more likely" "assume prejudice when a juror contact is made by an individual whose credibility the jury may need to assess." *Id.* ¶ 42; *see also State v. Erickson*, 749 P.2d 620, 621 (Utah 1987); *State v. Pike*, 712 P.2d 277, 280 (Utah 1985); *State v. Anderson*, 237 P. 941, 944 (Utah 1925); *State v. Swain*, 835 P.2d 1009, 1011 (Utah Ct. App. 1992).

¶142 Here, Juror 7 wasn't sure "if it was [Bree] or who she was talking to" that made the statement in question. If it was Bree who made the statement, this would strongly favor applying the presumption of prejudice, given that Bree was "an individual whose credibility the jury [would] need to assess." *Soto*, 2022 UT 26, ¶ 42. If it was Bree's companion who made the statement, this factor would not weigh in favor of the presumption quite as strongly. But even so, as explained, the other person in question was Bree's attorney, and we think it natural to assume that Juror 7 would have understood this person to have been associated with Bree in some way; after all, Bree was the alleged victim in the case, and this person was sitting and conversing with her during the trial. As a result, in that circumstance, we think the factor would still weigh clearly in favor of applying the presumption.

¶143 **What.** On the what prong, the "more the communication is directly relevant to the trial, the more likely it is to trigger the presumption of prejudice," while "communications unrelated to the trial are less likely to trigger the presumption." *Id.* ¶ 62. On one end of the spectrum exist comments in which the "speaker opines on the defendant's guilt" or "touche[s] on the extremely sensitive issue of sentencing." *Id.* ¶¶ 62–63 (quotation simplified); *see also Logan City v. Carlsen*, 799 P.2d 224, 226 (Utah Ct. App. 1990). "On the other end of the spectrum" are "brief and innocent contacts unrelated to the case." *Soto*, 2022 UT 26, ¶ 65; *see, e.g., State v. Maestas*, 2012 UT 46, ¶ 70, 299 P.3d 892 (declining to

presume prejudice where the "communication with the jury did not involve any substantive issues" and "the interaction was brief and dealt with the timing of the jury's dismissal for the day").

¶144   Here, the information communicated was directly relevant to the case. Whoever made the statement was opining on the truthfulness of Wife's testimony. Camara argues on appeal that Wife was "a key defense witness." Wife provided general, defense-favorable testimony about the relationship between Camara and Bree. Wife also testified that she and the Camara children were with Camara and Bree during the drive on September 29, 2015, and that therefore the alleged encounter Bree described had not happened. But in the statement in question, either Bree or her attorney said, "[S]he's lying." This statement was directly germane to the credibility of a defense witness. We accordingly conclude that this factor weighs strongly in favor of applying the presumption of prejudice.

¶145   **Circumstances.** The circumstances prong is something of a catch-all that allows a court to consider "the fact-intensive nature of the inquiry." *Soto*, 2022 UT 26, ¶ 70. Examples of special circumstances that would weigh in favor of applying the presumption of prejudice include whether the improper contact occurred during jury deliberations, *see id.* ¶ 68, and whether the defendant faced capital punishment, *see id.* ¶ 69. The guiding principle is the defendant's right to trial by an impartial jury, "and the end goal should always be to ensure that [this right] has been maintained above suspicion." *Id.* ¶ 71 (quotation simplified).

¶146   Here, the State points out that only "one relevant juror" heard the statement in question. And this is true. But even so, *Soto* pointed to a past decision from the United States Supreme Court holding that "the number of jurors potentially influenced by the comments" in question was "of no moment," given that the defendant there "'was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.'" *Id.* ¶ 47 (quoting *Parker v. Gladden*, 385 U.S. 363, 366 (1966)). And other cases support the

view that the presumption of prejudice can apply even when improper contact was made with just one juror. *See, e.g., Erickson*, 749 P.2d at 621 (applying the presumption of prejudice where one juror had a conversation with a key state witness); *Anderson*, 237 P. at 944 (implying a presumption of prejudice where one juror rode to and from court with a witness); *Swain*, 835 P.2d at 1011 (applying the presumption of prejudice where one juror conversed with a witness about their high school reunion). Thus, the fact that only one juror heard the comments is not a circumstance that appreciably helps the State here.

¶147   On balance, the *Soto* test counsels in favor of applying the presumption of prejudice. The first two factors—*who* said *what*—weigh fairly clearly in favor of applying the presumption, and the third factor is neutral. Accordingly, prejudice to Camara here should have been presumed, and the State should be given an opportunity to attempt to rebut that presumption.

### III. Proceedings on Remand

¶148   At the time this issue arose in the district court, *Soto* had not yet been issued, so the district court's error in not applying a presumption of prejudice based on the *Soto* test is entirely understandable. Yet this was the procedural posture in *Soto* itself, and in that case the court assigned error to the district court's actions, and it remanded the case for the district court to allow the State the opportunity to rebut the presumption. *See* 2022 UT 26, ¶¶ 93–102. We take the same action here.

¶149   In so doing, we direct the district court to the *Soto* opinion, and we give the same instructions that our supreme court gave in *Soto*. There, the supreme court explained that whether the presumption has been rebutted presents a "fact-specific" inquiry, *id.* ¶ 94, that is "best left to the district court when possible," *id.* ¶ 102. Because we have now concluded that the presumption of prejudice applied, we accordingly "remand this matter back to the district court to determine whether the presumption of prejudice

has been . . . rebutted." *Id.* ¶ 103. In conducting that examination, the court should apply the principles set forth in *Soto*, *id.* ¶¶ 93–100. Among other things, the State may attempt to rebut the presumption by "call[ing] to testify the third parties who communicated with the jury," *id.* ¶ 96, or by "argu[ing] that its evidence of [Camara's] guilt was so strong that the improper contact[] made no difference in the jury's verdict," *id.* ¶ 98. "If the district court finds that the State did not rebut the presumption of prejudice beyond a reasonable doubt, [Camara] must be given a new trial." *Id.* ¶ 103. But if the court finds that the State has rebutted the presumption, then the case should be returned to this court for further proceedings.

—————